Odessa CARRION, Plaintiff-Appellant,

v.

YESHIVA UNIVERSITY,
Defendant-Appellee.

No. 759, Docket 75–7481.

United States Court of Appeals,
Second Circuit.

Argued April 9, 1976.

Decided May 7, 1976.

Victor Rabinowitz, New York City (Rabinowitz, Boudin & Standard, Dorian Bowman, New York City, on the brief), for plaintiff-appellant.

Daniel Riesel, New York City (Sidney Schutz and Winer, Newburger & Sive, Mark A. Chertok, Richard G. Leland, New York City, of counsel), for defendant-appellee.

Before FRIENDLY, MANSFIELD and MULLIGAN, Circuit Judges.

MULLIGAN, Circuit Judge:

The plaintiff, Mrs. Odessa Carrion, is a black citizen of the United States who was employed by defendant Yeshiva University (Yeshiva) as a Social Work Supervisor at Lincoln Hospital, an institution owned and operated by the City of New York. The hospital's professional services were supplied by the Albert Einstein College of Medicine, a division of Yeshiva, pursuant to an affiliation contract. The complaint here was filed on July 6, 1971 in the United States District Court for the Southern District of New York. It alleged that Yeshiva had discriminated against Mrs. Carrion because of her race by failing to promote her to three positions for which she had applied, and in discharging her from her employment in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, and 42 U.S.C. §§ 1981 and 1983. The action was set for a bench trial on May 21, 1975 before Hon. Whitman Knapp. After a two-day trial Judge Knapp dismissed the complaint at the close of plaintiff's case and rendered an oral opinion and findings. Both parties later submitted proposed findings of fact and conclusions of law. On June 13, 1975, Yeshiva moved pursuant to Sec. 2000e–5(k) of Title 42 for reasonable attorney's fees and discretionary costs, in accordance with Rule 54(d) of the Federal Rules of Civil Procedure. Judge Knapp subsequently filed a memorandum and order on July 28, 1975 substantially accepting the findings submitted by the defendant, and deeming them to be supplemental to those made in open court at the close of the plaintiff's case. On the same date, Judge Knapp filed an opinion (reported at 397 F.Supp. 852) awarding Yeshiva counsel fees in the sum of $5,000 and discretionary costs of $630.36. This appeal was taken from the order dismissing the complaint and the order awarding fees and costs.

## THE FACTS

Odessa Carrion was hired by Yeshiva in January, 1967 to work as a Social Worker Supervisor of the out-patient clinic in the

Department of Social Services at Lincoln Hospital at an annual salary of $11,000. Some time in March 1967 she spoke to Raymond Cagan, a Student Unit Supervisor, indicating that she was interested in his position which it was rumored would become vacant upon his promotion to another job. This position involved joint employment by both Yeshiva and New York University. Cagan was paid a salary of $9,500 by Yeshiva and $1,500 by New York University. The hiring required a joint decision by both universities. Cagan advised the plaintiff that the job when filled would pay only $9,500 since New York University would no longer supplement the salary of the Student Unit Supervisor. Mrs. Carrion, who was then making $11,000, indicated she was unprepared to take a decrease in salary, became angry and walked out of the meeting. Mrs. Carrion had also sent a letter of inquiry to a Professor Leon of New York University who was then in charge of that University's program at the hospital. She was later interviewed by Professor Leon but was never offered the job. (New York University was initially made a defendant in this action but was dismissed by agreement of the plaintiff on May 20, 1975.) Late in August 1967 Miss Avis Crocker, a Caucasian, was hired for the position at a salary of $10,500 which was $500 less than Mrs. Carrion's salary at the time. While Cagan only learned that the additional $1,000 was available at or about the time Miss Crocker was hired, Mrs. Carrion was never notified of the new salary figure. Miss Crocker, who like Mrs. Carrion had a master's degree in social work, had worked at Lincoln Hospital for a year longer than Mrs. Carrion. Mr. Cagan testified that he selected Miss Crocker because he had personally known and respected her work, that she had satisfactorily participated in the field work supervision of other social worker students a year before, and was deemed qualified and acceptable by New York University. Cagan also testified that he was aware of derogatory comments in her file but discounted them because he believed that they were caused by a personal dispute between Miss Crocker and her supervisor.

Mr. Cagan was not familiar with Mrs. Carrion's work, believed she would not submit to a cut in salary, and knew that she was looking for other jobs. The court below concluded that the selection of Miss Crocker as opposed to Mrs. Carrion was not based on racial or other invidious reasons. Miss Crocker concededly turned out to be unsatisfactory and was subsequently discharged from her job.

On August 24, 1967 Mrs. Carrion promptly filed a complaint with the Commissioner on Human Rights of the City of New York (the Commission) alleging that she was a Negro and that Miss Crocker's employment as a Student Unit Supervisor was a discriminatory and unlawful act under the Administrative Code of the City of New York.

The second allegedly discriminatory act occurred in the summer of 1967 when another Student Unit Supervisor's position became available. The position was made known to employees at Lincoln Hospital by circulating a memo which Mrs. Carrion admitted receiving in her later testimony before the Commission in 1969. Although Mrs. Carrion testified on the trial below that she had informed Cagan that she wanted the job, he stated that he was unaware of her interest. This is supported by Mrs. Carrion's testimony before the Commission in which she indicated that she did not approach Cagan but waited to see if she would be contacted. The court below did not credit Mrs. Carrion's trial testimony, finding that she deliberately remained silent, that she did not want the job and was "trying to make a case." The second position was filled by a Caucasian, Professor Levy. There was no evidence that he was less qualified than the appellant. After this Mrs. Carrion amended her complaint before the Commission to include this second incident.

The third alleged act of discrimination involved the position of Director of Social work at the Yeshiva Neighborhood Maternity Center, which was supervised by Doctor Joseph J. Smith. Mrs. Carrion did apply for this position after having been advised of the opportunity by Mr. Cagan. Dr.

Smith interviewed Mrs. Carrion but selected instead Mrs. DeMorrisey, a black woman, who in his opinion was better qualified. The court below found that Dr. Smith's selection of Mrs. DeMorrisey over Mrs. Carrion was based exclusively on his evaluation of their relative fitness for the job. While Mrs. Carrion testified that Dr. Smith had told her that her discrimination charges had angered the Einstein people and that she would not get the position until this was cleared up, Dr. Smith denied that he then knew of any such charges and further denied making the statement. The court credited the testimony of Dr. Smith and characterized Mrs. Carrion's statements as untruthful. Mrs. Carrion again amended her complaint before the Commission to include this third incident.

### Suspension and Discharge

The final acts of alleged discrimination involved Mrs. Carrion's suspension and ultimate discharge from Yeshiva. In late September 1969, while Mr. Cagan was on vacation, Mrs. Carrion unsuccessfully sought to persuade another female employee to sign a statement prepared by Mrs. Carrion that Cagan had made unwelcome sexual advances to the other woman in the spring of 1968. This incident provoked the anger of fellow social workers who had learned of the effort to injure the reputation of Mr. Cagan. Two memos were sent to Dr. Lubell, the Administrator in charge of the hospital for the City, and Abraham Silverberg, Liaison Administrator for Yeshiva at the hospital, in early October, 1969 by social workers protesting Mrs. Carrion's actions which they characterized as "a violation of the code of ethics of our profession," and requesting that "some action should be taken." Further memos from members of the Social Service Department on October 8 and 22, 1969 requested that Mrs. Carrion be immediately dismissed and threatened "appropriate actions." On or about October 22, 1969, Silverberg received a memorandum from Stanley Shulman, Assistant Administrator in charge of the City's Labor Relations at the hospital, indicating that still another female employee at the hospital had filed a grievance charging that Mrs. Carrion had attempted to coerce that employee into signing a false statement of charges against Mr. Cagan. The Shulman memorandum concluded, "I respectfully suggest that Mrs. Carrion is unfit to work here."

In addition, the court found that two unions, Local 1199 of the Drug and Hospital Workers Union, which represented Yeshiva's employees at Lincoln Hospital, and District Council 37, which represented City employees at Lincoln, demanded that Mrs. Carrion be discharged and threatened a work stoppage. Finally, on October 28, 1969, Mr. Silverberg sent a memo to Mrs. Carrion, which is set forth in the margin,[1] suspending her with pay for no longer than three weeks pending investigation and indicating that she might be requested to appear for investigatory conferences. Mrs. Carrion refused to accept Silverberg's authority to suspend her, refused to absent herself from the hospital and sent a letter on October 29th to this effect to Dr. Lubell, with copies to six other officials. Her letter is also set forth in the margin.[2]

---

1. "This is to inform you that you are suspended, with pay, effective immediately, pending investigation.

   "For your information, a number of Social Service staff has insisted that your employment with the College of Medicine be terminated, on the ground that certain of your acts have been unprofessional and have tended to disrupt the effective functioning of the Social Service Department and the activities of the affiliation at Lincoln Hospital.

   "Your suspension will be for no longer than three (3) weeks, during which time you are requested to absent yourself from your duties and from the Social Service Department. This will give the Administration an opportunity to make full investigation of the circumstances. You may be requested to appear for investigatory conferences."

2. "This is to bring to your attention the statement informing me that I was being suspended for 3 weeks signed by Mr. Abraham Silverberg without giving me a hearing or spelling out specific charges against me.

On October 31, 1969, after consulting counsel and a city administrator, Silverberg discharged Mrs. Carrion for insubordination. Mrs. Carrion once more amended her complaint before the Commission to include the acts of suspension and discharge.

In its Final Decision and Order of January 22, 1970, the City Commission on Human Rights found that Mrs. Carrion had been discriminated against because of her race with respect to the first two job opportunities we have discussed, and that her suspension and discharge were in retaliation for her opposition to discriminatory practices. The Commission ordered Mrs. Carrion's reinstatement at Lincoln Hospital with back pay in the amount of $3,200.14 plus the sum of $100 compensatory damages. Yeshiva thereupon commenced an Article 78 proceeding in the New York Supreme Court to review the Commission's findings. In an opinion dated August 6, 1970, Justice Dollinger granted Yeshiva's petition and annulled the determination of the Commission.[3] He held that:

> The finding that the supervisor engaged in discriminatory practices is not supported by substantial evidence.

He further found that the failure to consider Mrs. Carrion was "the direct result of her telling him that she was unwilling to accept a reduction in salary." The court concluded:

> The record also establishes that while the supervisor was on vacation, away from the hospital, the complainant under-

"As the laison [sic] officer, Mr. Silverberg does not have the authority to take this action as well as no basis on which to base such a suspension. This action represents a violation of his own position and abusing his own authority. The ludicrous basis which he is using is based on a petition where I had no hearing and on rumored hearings at which I was not present. This kind of action demonstrates his abuse of his authority as well as his irregular behavior. I am requesting clarification of this matter as well as the charges I placed against the workers in Social Service. I gave you a copy of the latter document on 10/23/69.

"I am requesting that proper action be taken against Mr. Silverberg for his reckless intrusion into the affairs of the Social Service

took a course of conduct to discredit him by having fellow employees make complaints with respect to his character. It was these activities which respondent describes as "may well be ill-advised" that led her fellow employees to assert grievances against her through their union representatives and led to her suspension. The substantial evidence established that complainant's subsequent unjustified insubordination resulted in her discharge.

The Commission in its decision had further found that Yeshiva was "totally insensitive to racial relations with respect to both staff and community." Mrs. Carrion had made no such charge and the court found no substantial evidence to support the findings, and commented that Yeshiva had been "denied the essential element of fair play required in every administrative proceeding." The Commission appealed and the Appellate Division, First Department unanimously affirmed the Supreme Court decision on February 18, 1971.[4] Leave to appeal to the Court of Appeals was denied on May 13, 1971.[5] The action below was then commenced on July 6, 1971.

## COUNSEL FEES

Appellant's first argument here is that the District Court abused its discretion in awarding Yeshiva counsel fees in the sum of $5,000. There is no doubt that 42 U.S.C. § 2000e–5(k), invoked by the defendant, explicitly provides that "the court, in its discretion, may allow the prevailing party, other than the Commission or the Unit-

Dept., in order to cause damage to me as a result.

"I will continue to service my patients from the 17 clinics which my unit covers as they would suffer severely in by absence. There is no worker in my unit qualified or trained to take over this complicated and demanding service."

3. *Yeshiva University v. Commission on Human Rights of the City of New York,* Index No. 6224 (Bronx County).

4. 36 A.D.2d 693, 318 N.Y.S.2d 669.

5. 28 N.Y.2d 488, 323 N.Y.S.2d 1025, 271 N.E.2d 922.

ed States, a reasonable attorney's fee as part of the costs." It is not disputed that the prevailing party may be either the plaintiff or the defendant. *Alyeska Pipeline Service Co. v. Wilderness Society*, 421 U.S. 240, 261–62, 95 S.Ct. 1612, 1624, 44 L.Ed.2d 141, 155 (1975).

The rationale for permitting counsel fees to the prevailing plaintiff has been explicated by the Supreme Court in the so-called *Newman-Northcross* rule which, in cases involving actions under Title II of the Civil Rights Act of 1964 and the Emergency School Aid Act of 1972,[6] routinely permits the prevailing plaintiff to recover counsel fees unless special circumstances render such an award unjust. As we have recently stated, "[t]he rationale underlying these cases is that private parties who commence such litigation are 'private attorneys general' vindicating a policy to which Congress gave the highest priority, the elimination of racial discrimination." [7]

This is not the sole rationale, however, since the statute does not limit the award of fees to plaintiffs. Although appellant argues that permitting a prevailing *defendant* an award of attorney's fees discourages the civil rights litigant from initiating litigation and thus frustrates the policy of the Civil Rights Acts, the answer undoubtedly is that the Congressional intention was to encourage responsible litigation but to discourage baseless or frivolous actions.

As pointed out in *United States Steel Corp. v. United States*, 385 F.Supp. 346, 348 (W.D.Pa.1974), aff'd, 519 F.2d 359 (3d Cir. 1975):

> [S]ection 706(k) of Title VII of the Civil Rights Act of 1964 emerged as an accommodation between two congressional concerns. The first, the inability of low income minorities to bear the financial burden of attorney's fees in vindicating their Civil Rights; and, secondly, the award of attorney fees to those parties who must defend against unreasonable, frivolous, meritless or vexatious actions brought by either private parties or the government.[8]

We conclude, therefore, that while a successful plaintiff in Title VII cases is routinely permitted to recover counsel fees under the *Newman-Northcross* rule, a prevailing defendant should be permitted such fees, not routinely, not simply because he succeeds, but only where the action brought is found to be unreasonable, frivolous, meritless or vexatious. The court below fully recognized this issue and cited *Newman* in its opinion. As Judge Knapp stated, "concededly, discretion should be sparingly exercised in awarding attorney's fees and taxing costs against a Title VII plaintiff . . . . However this case presents an occasion for the exercise of such discretion." 397 F.Supp. at 852.

■ It is well established that the award of attorney's fees here is within the discretion of the trial court and will not be

---

**6.** The rule is derived from *Newman v. Piggie Park Enterprises, Inc.*, 390 U.S. 400, 88 S.Ct. 964, 19 L.Ed.2d 1263 (1968) (per curiam) and *Northcross v. Board of Educ.*, 412 U.S. 427, 93 S.Ct. 2201, 37 L.Ed.2d 48 (1973) (per curiam). *Newman* was the Title II case (§ 204, 78 Stat. 244, 42 U.S.C. § 2000a-3), and *Northcross* dealt with the Emergency School Aid Act (§ 718, 86 Stat. 369, 20 U.S.C. § 1617).

**7.** *Fort v. White*, 530 F.2d 1113, 1117–1118 (2d Cir. 1976). In that case we refused to apply the *Newman-Northcross* rule to an action brought under Title VIII of the Civil Rights Act of 1968, which provides for an award of both actual and punitive damages to a prevailing plaintiff. The *Newman-Northcross* rule was based in part on the premise that the statutes there only provided for injunctive relief, thus emphasizing the necessity for *routinely* award-

ing the civil rights plaintiff reasonable counsel fees. Title VII here involved also provides only injunctive relief; hence the *Newman-Northcross* rule should apply and appellee does not contend otherwise.

**8.** The legislative history of a comparable provision for attorney's fees in Title II of the Civil Rights Act of 1964, 42 U.S.C. § 2000a-3(b), is set forth in *United States v. Gray*, 319 F.Supp. 871, 872 (D.R.I.1970). Senator Lausike commented during the debate: "That language was inserted in the bill to deter the bringing of lawsuits without foundation. 110 Cong.Rec. at 13189–90." Senator Pastore commented: "The purpose of this provision . . . is to discourage frivolous suits . . . . 110 Cong. Rec. at 13720–21." See also *Bell v. Alamatt Motel*, 243 F.Supp. 472 (N.D.Miss.1965).

upset unless abused. *Sprogis v. United Air Lines, Inc.,* 517 F.2d 387, 391–92 (7th Cir. 1975); *Evans v. Sheraton Park Hotel,* 164 U.S.App.D.C. 86, 503 F.2d 177, 187 (1974). We find no abuse of discretion here. As appellant admits, substantially the same charges which were brought in the Title VII action had previously been litigated before the Commission and in the New York courts. Although she was substantially successful in the agency hearings before the Commission, that order was reversed and annulled by the New York State Supreme Court, whose order was affirmed unanimously by the Appellate Division with leave to appeal to the Court of Appeals denied. It was only after that appellate process had been exhausted that the instant action based on the same facts was commenced in the district court.

In affirming *United States Steel Corp. v. United States, supra,* Judge Adams in writing for the court commented:

A routine allowance of attorney fees to successful defendants in discrimination suits might effectively discourage suits in all but the clearest cases, and inhibit earnest advocacy on undecided issues.

519 F.2d at 364–65. Here, of course, the award was not routine and the issues had been decided. Not having been a party to the Article 78 proceeding, Mrs. Carrion was by no means precluded from bringing the present action. However, in view of the failure of the previous litigation, she and her counsel must have been aware of the possibility of an award of counsel fees to her adversary. *Tabula rasa non erat.* But there is much more to show vindictiveness here. Judge Knapp's findings of fact as to credibility are, of course, subject to the "unless clearly erroneous" test on appellate review. Fed.R.Civ.P. 52(a). After a two-day bench trial he concluded that Mrs. Carrion's testimony "constituted an unmitigated tissue of lies; that no one had discriminated against her; and that the reason she was fired was that she had engaged in deliberately disruptive conduct having nothing to do with the exercise of any constitutional or statutory right (but was

motivated solely by spleen) and because she had defied reasonable attempts to control her activities." 397 F.Supp. at 852–53 (footnote omitted). He further found that she had "deliberately perjured herself." Id. at n.*.

As we have previously noted, the record reveals that Mrs. Carrion's testimony was in part contradicted by other witnesses and by her own previous testimony before the Commission. A specific finding below was that "The plaintiff, Mrs. Odessa Carrion, testified at trial and her testimony was not credible and was not believable as it related to the material allegations." The court specifically credited the testimony of Abraham Silverberg, corroborated by two other witnesses; the court also credited the testimony of Mr. Raymond Cagan before the Commission, as well as the testimony of Dr. Joseph J. Smith, called in the proceeding below by Yeshiva during the plaintiff's case with the express consent of the plaintiff.

Even more damaging in our view were the efforts of Mrs. Carrion to ruin the reputation of Cagan, her vacationing supervisor, by attempting to obtain the false testimony of two female employees. This campaign backfired and created the antagonism of her peers who, through their union grievance procedures, demanded her discharge. The picture is not pleasant and the only conclusion we can reasonably reach is that the litigation commenced here was motivated by malice and vindictiveness and that it was without merit. In our view, this is the very species of litigation which the Congress intended to discourage by the award of counsel fees to the defendant. Racial or religious discrimination is odious but a frivolous or malicious charge of such conduct, particularly when made against an eleemosynary institution of higher learning, is at least equally obnoxious.

We find no reason to hold any of the findings of fact clearly erroneous but rather conclude that they are supported by the evidence. Further, we find no abuse in fixing the amount of attorney's fees in the sum of $5,000. Yeshiva is certainly not made whole. It utilized house counsel for

which no claim is made but was also compelled to retain outside counsel which expended 120 hours of partner's time and 70 hours of associates' time in defending the litigation. Mrs. Carrion is now employed elsewhere at a salary of $25,000 per annum and has no dependents.

Appellant argues that her uncompensated civil rights counsel who represented her below will be stigmatized by reason of the characterization of the frivolous and vindictive nature of the action. We cannot agree. We are of course not privy to whatever representations may have been made by Mrs. Carrion to such counsel prior to the commencement of this action. We note that they did not represent her on this appeal, and that her present counsel has appeared only on this appeal.

The statute in any event contemplates that both plaintiff and defendant are entitled to counsel fees. When as here the defendant is successful in defending a baseless, malicious action, it could hardly be contended that since the plaintiff was also represented by counsel there could never be an award to defendant's counsel. There is no presumption that we know of which would impute the malice of a client to counsel. Counsel is not castigated or penalized here. The plaintiff was entitled to her day in court and now should, in these circumstances, be assessed the fees fixed by the court in its discretion as authorized by statute.[9]

## DUE PROCESS

As we have indicated, the plaintiff pleaded in the amended complaint not only a Title VII claim but also a claim under 42 U.S.C. §§ 1981 and 1983. The claims of discrimination which we have already discussed are specifically within Subchapter VI of Title 42 § 2000e et seq., which deals exclusively with equal employment opportunities and therefore makes reference to §§ 1981 and 1983 superfluous. No greater or lesser protection against discriminatory practices is provided in the latter sections and we do not understand appellant to argue otherwise.

Appellant argues however as Point II of her appeal that "Yeshiva's dismissal of plaintiff without notice and a hearing amounted to state action in violation of the Fourteenth Amendment and deprived plaintiff of her liberty and her property without due process of law." The appellant complains that the court below did not even reach this issue and that this constitutes error. With respect to the dismissal procedure, a sentence in Par. VIII of the seven-page amended complaint alleges that it violated due process. However, the prayer for relief makes no mention of any due process relief and makes no demand for a hearing of any kind. It appears from a reading of the record that the principal emphasis in the litigation below was upon the allegedly discriminatory practices in refusing Mrs. Carrion promotion as well as dismissing her, in retaliation for her having charged Yeshiva with employment discrimination. In fact, that charge is made in the same Par. VIII of the amended complaint where the due process issue was raised. In view of the fact that Mrs. Carrion has become employed at double her prior salary at Yeshiva, it is understandable that a hearing was hardly of major moment to her at the time of litigation. The due process issue was submerged in the pleadings and was not separately pleaded. In any event, we cannot agree that the issue was not ignored below although obviously not emphasized in the findings. Thus in his oral opinion dismissing the complaint, after reviewing the

9. Mrs. Carrion's counsel argues that however the case with respect to attorneys' fees might stand if her Title VII action stood alone, the situation is altered by the presence of the due process claim under § 1983 discussed in the following portion of this opinion; he contends that a holding awarding counsel fees in an action which combines a frivolous and an arguably non-frivolous claim would "only serve to discourage a claimant from joining together in one lawsuit all of his causes of action." We disagree. Such a holding would make costly only the joinder of a *frivolous* claim, and it is unlikely that this would "cost" less when prosecuted alone, without the good faith joinder of a genuine claim. It is clear that the award here was made only in respect of the defense of the Title VII claim.

suspension of Mrs. Carrion and her letter challenging Mr. Silverberg's authority, Judge Knapp concluded, "[i]n those circumstances I think it was within his competence to decide that further investigation would be fruitless, and he fired her for insubordination, which needed no hearing to be established." Judge Knapp further stated, "[a]s to the suspension and subsequent firing, I do not reach the question whether it was state action or whether it was not state action."

In his formal conclusions of law Judge Knapp found that the overwhelming evidence indicated that her suspension and subsequent discharge "was brought about by her deliberate and calculated insubordination." He further added that her suspension and discharge "did not deprive her of any rights under the Constitution or laws of the United States."

No claim is or could be made on this appeal that Mrs. Carrion's *suspension* violated due process rights. It is settled that an emergency justifies an administrator's taking temporary action without a hearing even in cases where due process requires one before final action is taken. *Fahey v. Mallonee*, 332 U.S. 245, 67 S.Ct. 1552, 91 L.Ed. 2030 (1947); *R. A. Holman & Co. v. SEC*, 112 U.S.App.D.C. 43, 299 F.2d 127, *cert. denied*, 370 U.S. 911, 82 S.Ct. 1257, 8 L.Ed.2d 404 (1962); 1 Davis, Administrative Law Treatise § 7.08 (1958) and 1970 Supp. The threat of unions representing the hospital's employees to strike unless action was taken against Mrs. Carrion clearly created an emergency. Instead of yielding to the union requests that he discharge Mrs. Carrion, Silverberg took the moderate action of suspending her with pay for not more than three weeks while the matter was being investigated. There is every reason to believe that she would have had some kind of hearing if she had not aborted the process by her unwarranted refusal to accept the suspension. Even after her discharge for insubordination she made no request of the hospital authorities for a hearing on that issue. Under these circumstances we find it unnecessary to consider whether the action taken by Silverberg was state action and, if so whether it deprived Mrs. Carrion of liberty or property within the principles stated in *Board of Regents v. Roth*, 408 U.S. 564, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972), and *Perry v. Sindermann*, 408 U.S. 593, 92 S.Ct. 2694, 33 L.Ed.2d 570 (1972).

 We find no merit in appellant's contention that the trial court abused its discretion by declining to adjourn the trial to hear a witness who had been permitted to leave the court by plaintiff's counsel. The record indicates that the witness's prior testimony before the Commission was read by the court. The determination whether to adjourn was well within the discretion of the trial judge and we see no abuse here. *Payne v. Capital Transit Co.*, 86 U.S.App. D.C. 172, 181 F.2d 613 (1950).

Affirmed.