Salvatore FARACI, Plaintiff-Appellant,

v.

HICKEY–FREEMAN COMPANY, INC.,
and Amalgamated Clothing Workers of
America, Defendants-Appellees.

No. 39, Docket 79–7169.

United States Court of Appeals,
Second Circuit.

Submitted Sept. 7, 1979.

Decided Sept. 28, 1979.

Salvatore Faraci, pro se.

Thomas B. Garlick, Rochester, N. Y., Hickey, McHugh & Garlick, Rochester, N. Y., for defendant-appellee, Hickey-Freeman Company, Inc.

Michael T. Harren, Rochester, N. Y., Chamberlain, D'Amanda, Bauman, Chatman & Oppenheimer, Rochester, N. Y., for defendant-appellee, Amalgamated Clothing Workers of America.

Before KAUFMAN, Chief Judge, and NEWMAN and KEARSE, Circuit Judges.

KAUFMAN, Chief Judge:

I

The Hickey-Freeman Company (the Company) is a men's clothing manufacturer of national repute. The majority of the 1800 workers at its Rochester, New York plant are of Italian origin. Salvatore Faraci, a master tailor, was recruited by Hickey-Freeman from his home in Italy, and began work as a coat collar baster in Rochester in August of 1967. During this period, he also became a member of the Amalgamated Clothing Workers of America (the Union).

Fifteen months later, Faraci first experienced difficulties in his relations with his co-workers and immediate superiors. At that time he became abusive toward a foreman who had rejected some of his work as substandard. Following investigation by the Company, Faraci was discharged, then reinstated three days later after his union intervened. Faraci continued to work for the Company until June 9, 1971, when a shouting match erupted at the plant between him and another employee. Nicolas Vernacatola, a foreman, issued a complaint slip charging Faraci with disrupting the shop, and Faraci, incensed, tore up the slip, accusing the foreman of being "too young

to be a boss." He thereupon left the factory without authorization.

The incident prompted an informal hearing before Assistant Labor Manager Robert Morthurst, with Faraci, Vernacatola and Vito Costanzo, the Union shop steward, present. Despite Costanzo's protests, Faraci was discharged and, this time, the Union's efforts to obtain his reinstatement through informal discussions proved unavailing. The Union's business agent, Nicholas Del Veccio, called upon the Company to schedule a formal hearing, but abandoned this effort when Faraci indicated that he preferred to "go to Washington" and pursue statutory remedies.

In an effort to seek redress for the injustices he perceived, Faraci petitioned three government agencies. He first filed a complaint with the National Labor Relations Board, charging the Union with inadequate representation. After investigation, however, the Board refused to issue a complaint. Faraci then turned to the New York State Division of Human Rights, alleging the Company had discriminated against him on the basis of his national origin. The Division conducted a thorough investigation, but found no probable cause to believe the Company had engaged in discrimination. Instead, it concluded that Faraci's termination had resulted from "interpersonal difficulties with co-workers and supervisors," and was not affected by his ancestry in any way. Faraci finally went to the Buffalo District Office of the Equal Employment Opportunity Commission, which, without investigation, issued a right-to-sue letter under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e–5(f)(1).

In his complaint in the district court Faraci, pro se, alleged that the Company paid Italian workers substantially lower wages than their American-born counterparts, that his termination and the Union's subsequent failure to obtain his reinstatement were discriminatory, and that the Company's refusal to rehire him was an act of retaliation for his filings before the Human

Rights Commission.[1] Leave was granted to proceed *in forma pauperis* and the case referred to Magistrate Maxwell for a full hearing and report.

None of the eight Hickey-Freeman employees whom Faraci called during the two-day hearing confirmed his allegations. Indeed, the defendants presented their case entirely through cross-examination, finding it unnecessary to call witnesses of their own. Accordingly, the Magistrate found the plaintiff's charges entirely groundless, and recommended dismissal of the complaint.

Judge Curtin adopted the Magistrate's report, but referred the case to Maxwell once again for consideration of defendants' motion for attorneys' fees under 42 U.S.C. § 2000e–5(k). The defense lawyers claimed that the reasonable value of their services was $11,500, but in light of the plaintiff's limited ability to pay, the Company sought only $1,500 in fees and the Union $1,000. Magistrate Maxwell did not make a finding of bad faith on Faraci's part in bringing suit, but concluded the action was "frivolous, unreasonable and without any foundation whatsoever." Pursuant to *Christiansburg Garment Co. v. E.E.O.C.,* 434 U.S. 412, 98 S.Ct. 694, 54 L.Ed.2d 648 (1978), the Magistrate accordingly recommended that defendants receive the full amount of fees requested. Judge Curtin once again adopted the Magistrate's recommendation, and this appeal followed.

## II

■ We are convinced that the district court properly dismissed the complaint and adopted the Magistrate's finding that the suit was frivolous. *Powell v. Syracuse University,* 580 F.2d 1150, 1156 (2d Cir. 1978), *cert. denied,* 439 U.S. 984, 99 S.Ct. 576, 58 L.Ed.2d 656 (1979). Uncontradicted evidence revealed that sixty percent of the workers and eighty-five percent of the foremen at the Rochester plant were of Italian extraction. Moreover, the surnames of each of the Union officials who testified or were referred to in the action indicated Italian ancestry. Indeed, Faraci failed to show that his outbursts and acts of insubordination were dealt with any differently by Company and Union officials than were similar delicts on the part of American-born employees. Nevertheless, although the judgment dismissing the action is affirmed, the award of attorneys' fees requires further discussion.

## III

### A

■ The standard by which we allocate counsel fees between a victorious litigant and his opponent can have a substantial effect on settlement negotiations, and, indeed, on a prospective plaintiff's very decision to bring suit. *Fleischmann Distilling Corp. v. Maier Brewing Co.,* 386 U.S. 714, 718, 87 S.Ct. 1404, 18 L.Ed.2d 475 (1967). In the early days of the Republic, American courts and legislatures recognized the strong disincentive against the institution of meritorious suits engendered by the British practice of routinely awarding full attorneys' fees to prevailing defendants.[2] By 1796, the exclusion of counsel fees from recoverable damages was the "[t]he general practice of the United States." *Arcambel v. Wiseman,* 3 U.S. (3 Dall.) 306, 1 L.Ed. 613 (1796); *accord, Alyeska Pipeline Service Co. v. Wilderness Society,* 421 U.S. 240, 95 S.Ct. 1612, 44 L.Ed.2d 141 (1975). Nonetheless, in unusual circumstances, federal courts have retained the inherent power to tax attorneys' fees as costs, for example, when

---

1. Faraci's somewhat discursive complaint also attributes a number of shop-floor incidents to unlawful discrimination, including the Company's failure to replace a burned-out lightbulb, and a production manager's direction that he sit near an open window. He also alleged several discriminatory denials of vacation pay by the Company that the Union did not adequately redress.

2. Although fee shifting was unknown at common law, the English courts were authorized by statute to award counsel fees to successful plaintiffs as early as 1278. Victorious defendants became eligible for such awards only in 1607. *Fleischmann Distilling Corp. v. Maier Brewing Co.,* 386 U.S. 714, 717, 87 S.Ct. 1404, 18 L.Ed.2d 475 (1967).

litigants proffer meritless defenses in bad faith. *F. D. Rich Co., Inc. v. Industrial Lumber Co.,* 417 U.S. 116, 129, 94 S.Ct. 2157, 40 L.Ed.2d 703 (1974); *see Vaughan v. Atkinson,* 369 U.S. 527, 530, 82 S.Ct. 997, 8 L.Ed.2d 88 (1962). Recent legislation extending the power of federal courts to award attorneys' fees by no means requires abandonment of the equitable principles that have traditionally governed a court's discretion in such matters. On the contrary, the express grant of authority to award fees presumes continued application of equitable considerations in appropriate cases, both to effectuate the broader legislative purpose and to do justice in the particular case. *See, e. g., Bradley v. Richmond School Board,* 416 U.S. 696, 718, 94 S.Ct. 2006, 40 L.Ed.2d 476 (1979); *Carrion v. Yeshiva University,* 535 F.2d 722 (1976).

Title VII of the Civil Rights Act of 1964 provides that "the court, in its discretion, may allow the prevailing party . . . a reasonable attorney's fee as part of the costs," 42 U.S.C. § 2000e–5(k). Because the Act relies heavily on private enforcement to reify its goal of social equality, fee awards to successful plaintiffs have now become routine, particularly in injunctive actions, *Robinson v. Lorillard Corp.,* 444 F.2d 791 (4th Cir.) *cert. dismissed,* 404 U.S. 1006, 92 S.Ct. 573, 30 L.Ed.2d 655 (1971); *see Carrion, supra,* 535 F.2d at 727. This same objective counsels that where a defendant prevails, and the broader social policy has not been vindicated, a high barrier to fee shifting must be erected. Congress, moreover, intended to discourage unnecessary and harassing Title VII litigation. Accordingly, in *Christiansburg, supra,* 434 U.S. at 421, 98 S.Ct. 694, the Court held that successful defendants in Title VII actions are entitled to attorneys' fees only where the suit is "frivolous, unreasonable, or without foundation."

■ But to acknowledge that a party is eligible for attorneys' fees only begins the inquiry, for the court must then ascertain the proper amount of the award. It should, first of all, reflect a reasonable compensation for work done, tempered by a concern for the difficulty of the case and quality of the advocacy, *Lindy Brothers Builders, Inc.,*

*of Philadelphia v. American Radiator and Standard Sanitary Corp.,* 487 F.2d 161 (3d Cir. 1973), *modified on other grounds,* 540 F.2d 102 (1976). But because fee awards are at bottom an equitable matter, *Hall v. Cole,* 421 U.S. 1, 93 S.Ct. 1943, 36 L.Ed.2d 702 (1973), courts should not hesitate to take the relative wealth of the parties into account. *See Bradley v. Richmond School Board,* 416 U.S. 696, 718, 94 S.Ct. 2006, 40 L.Ed.2d 476 (1974); *Sprogis v. United Air Lines, Inc.,* 517 F.2d 387, 390 (7th Cir. 1975); *Flora v. Moore,* 461 F.Supp. 1104, 1122 (N.D.Miss.1978).

■ Where the plaintiff can afford to pay, of course, the congressional goal of discouraging frivolous litigation demands that full fees be levied. And, in *Christiansburg, supra,* the Court recognized the possibility of fee awards against the EEOC itself for instituting meritless suits. Moreover, in *Carrion, supra,* this Court upheld a $5,000 fee assessed against a plaintiff who, after her discharge from a $11,000 position, had obtained employment elsewhere at $25,000 per annum. The vindictiveness that motivated Mrs. Carrion, 535 F.2d at 728, was not a prerequisite to recovery, *Christiansburg, supra,* 434 U.S. at 421, 98 S.Ct. 694, but, like plaintiff's financial status, it is a factor that should be weighed in fixing an appropriate amount. *See id.* at 422, 98 S.Ct. 694.

**B**

■ Although fee awards are a matter within the discretion of the trial judge, appellate courts will intervene when the trier omits a relevant factor from his analysis. *See Lindy Brothers, supra,* at 166. Here, Magistrate Maxwell, in a report adopted by Judge Curtin, failed to give consideration to Faraci's credible and uncontroverted affidavits listing his monthly income as $462 and his most basic living expenses—including food, shelter and medicine—as $399 per month. Permanently disabled by occlusive coronary artery disease, Faraci has required open-heart bypass surgery, and is under continuing treatment.

Commendably, the defendants' attorneys reduced their fee requests in light of plaintiff's financial condition and, moreover, Magistrate Maxwell indicated his aware-

ness of Faraci's straitened circumstances. We hold, however, that a more focused inquiry into the equities of the situation is required.

In determining the size of the award, the court below should have ascertained whether, in light of Faraci's ability to pay, a lesser sum assessed would have fulfilled the statute's deterrent purpose without subjecting him to financial ruin. Moreover, the plaintiff's degree of good faith in prosecuting the action should have also been considered.

After examining Faraci's affidavits setting forth his income and medical expenses, and in light of his readily apparent good faith in prosecuting this action and appeal, we deem an award of $200, $120 to the Company and $80 to the Union, sufficient to effectuate the deterrent function of § 2000e–5(k). Accordingly, the case is remanded to the district court for the entry of an order taxing attorneys' fees in accordance with this opinion.