**AMERICAN FEDERATION OF STATE, COUNTY AND MUNICIPAL EMPLOYEES, AFL–CIO (AFSCME), et al., Plaintiffs,**

v.

**COUNTY OF NASSAU, et al., Defendants.**

No. CV–84–1730.

United States District Court, E.D. New York.

June 24, 1993.

Joel I. Klein, Klein, Farr, Smith & Taranto, Washington, DC, for plaintiffs.

William H. Pauley III, Snitow & Pauley, New York City, for defendants.

## MEMORANDUM AND ORDER

GLASSER, United States District Judge:

The plaintiffs commenced this class action pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*, and pursuant to the Equal Pay Act of 1963, 29 U.S.C. § 206(d), alleging that the County of Nassau "discriminates in compensation on the basis of sex by paying historically female job classifications which require an equivalent or lesser composite of skill, effort, responsibility and working conditions" less than historically male job classifications. Also alleged were specific violations of the Equal Pay Act. The plaintiffs sought injunctive relief, back pay, liquidated damages, costs and attorney's fees.

Pre-trial motions resulted in the dismissal of the Equal Pay Act claims of specifically named plaintiffs; the dismissal of the Title VII claims of all plaintiffs predicated upon a disparate impact theory; and the dismissal of the Title VII claims of all male plaintiffs. Subsequently, the court certified a class and designated the class representatives. *See A.F.S.C.M.E. v. Nassau County,* 609 F.Supp. 695 (E.D.N.Y.1985) and 664 F.Supp. 64 (E.D.N.Y.1987). A stipulation was then entered into bifurcating the liability aspect of the action. The trial of that segment began on November 27, 1989 and ended on May 11, 1990. In an opinion reported in 799 F.Supp. 1370 (E.D.N.Y.1992), the court held that the plaintiffs failed to prove violations of Title VII or of the Equal Pay Act by a preponderance of the evidence as to all claims, except for the Title VII claims of the class members employed as police detention aides.

Thereafter, the defendants moved this court for an order pursuant to 42 U.S.C. § 1988 awarding them reasonable attorney's fees in the amount of $982,407.23 and expert witness fees in the amount of $550,974.66 as the prevailing party in the action. More precisely, the statutory authorization for the recovery of attorney's fees in this case is 42 U.S.C. § 2000e–5(k) which provides:

> In any action or proceeding under this subchapter the court, in its discretion, may allow the prevailing party, ... a reasonable attorney's fee (including expert fees) as part of the costs. ...

The provision for expert fees was added by the Civil Rights Act of 1991 by which Congress overruled the Supreme Court's decision in *West Virginia Univ. Hosps., Inc. v. Casey,* 499 U.S. 83, 111 S.Ct. 1138, 113 L.Ed.2d 68 (1991). The issue of expert fees will be addressed after the court determines whether an allowance of reasonable attorney's fees to the defendants may be made.

Although the statute as it emerged from Congress provides for the discretionary award of a reasonable attorney's fee to *"the prevailing party"* without distinguishing between the plaintiff and the defendant as the prevailing party, the Court engrafted such a distinction upon it in *Christiansburg Garment Co. v. E.E.O.C.,* 434 U.S. 412, 98 S.Ct. 694, 54 L.Ed.2d 648 (1978). The question in that case was "what standard should inform a district court's discretion in deciding whether to award attorney's fees to a successful *defendant* in a Title VII action." *Id.* at 417, 98 S.Ct. at 698. The Court acknowledged that the legislative history of § 2000e–5(k) was sparse. Brief references to the remarks of three Senators in the legislative debates led to the observation that:

> If anything can be gleaned from these fragments of legislative history, it is that while Congress wanted to clear the way for suits to be brought under the Act it also wanted to protect defendants from burden-

some litigation having no legal or factual basis.

*Id.* at 420, 98 S.Ct. at 700. The Court noted that:

> The Court of Appeals for the District of Columbia Circuit seems to have drawn the maximum significance from the Senate debates when it concluded:
>
> > [From these debates] two purposes for § 706(k) emerge. First, Congress desired to "make it easier for a plaintiff of limited means to bring a meritorious suit".... But second, and equally important, Congress intended to "deter the bringing of lawsuits without foundation" by providing that the "prevailing party"—be it plaintiff or defendant—could obtain legal fees. *Grubbs v. Butz,* 179 U.S.App.D.C. 18, 20, 548 F.2d 973, 975.

*Christiansburg,* 434 U.S. at 420, 98 S.Ct. at 700.

The federal appellate courts which had previously considered the question had decided that a fee award could not be made to a prevailing defendant if the action had not been "unfounded, meritless, frivolous or vexatiously brought." *See United States Steel Corp. v. United States,* 519 F.2d 359, 363–64 (3rd Cir.1975); *see also, Bolton v. Murray Envelope Corp.,* 553 F.2d 881, 884 n. 2 (5th Cir.), *reh'g denied,* 557 F.2d 823 (5th Cir. 1977); *Carrion v. Yeshiva Univ.,* 535 F.2d 722, 727 (2d Cir.1976). The formulation adopted by the Supreme Court was that:

> [A] plaintiff should not be assessed his opponent's attorney's fees unless a court finds that his claim was frivolous, unreasonable, or groundless, or that the plaintiff continued to litigate after it clearly became so. And, needless to say, if a plaintiff is found to have brought or continued such a claim in *bad faith,* there will be an even stronger basis for charging him with the attorney's fees incurred by the defense.

*Christiansburg,* 434 U.S. at 422, 98 S.Ct. at 701. The Court cautioned that:

> In applying these criteria, it is important that a district court resist the understandable temptation to engage in *post hoc* reasoning by concluding that, because a plaintiff did not ultimately prevail, his action must have been unreasonable or without foundation. This kind of hindsight logic could discourage all but the most airtight claims, for seldom can a prospective plaintiff be sure of ultimate success.

*Id.* at 421–22, 98 S.Ct. at 700.

Given the sparse legislative history, perhaps the correct path for the Court to have followed would have been the one marked by the plain meaning of the statute derived from the unambiguous words "prevailing party." If Congress did not intend that the prevailing party—whether it be plaintiff or defendant—could recover attorney's fees, it would have authorized fees only for one or the other. It is too late in the day, however, to gainsay the holding of *Christiansburg.* A consideration of the meaning of "frivolous," "unreasonable" or "groundless" and the extent to which those "abstract words can deal with concrete cases," *Christiansburg,* 434 U.S. at 421, 98 S.Ct. at 700, is, however, timely.

The application of those abstract words to this case can be made only with a familiarity of the findings of fact and conclusions of law which are reflected in the court's earlier opinion, reported at 799 F.Supp. 1370 (E.D.N.Y.1992). Although that familiarity is assumed, selected portions of that opinion, believed to be particularly relevant to the issue at hand, will be recalled. The plaintiffs' primary claim of a Title VII violation was that the defendants were guilty of intentional discrimination by systematically giving lower salary grades to predominantly female job titles than they would have given if they were not female-dominated. They also claimed that there were sex-related salary disparities between male-dominated job titles and female-dominated job titles which were the result of intentional discrimination. Unable to present any direct evidence of intentional discrimination by the defendants, the plaintiffs sought to prove their allegations indirectly, through the testimony of two expert witnesses.

One of those experts, a sociologist from the University of California at Los Angeles was retained to study and report as to whether Nassau County applied its own job evaluation system which was based on a management consultant study ("the Cresap study"), in a

consistent way. The court's assessment of the testimony of that expert was as follows:

> [T]he court is unable to credit the testimony and the report of Dr. Treiman as to the conclusions of this study. First, the court found Dr. Treiman himself to be extremely evasive and not entirely credible throughout much of his testimony.... Second, Dr. Treiman, in a subsequent report, recanted part of his conclusions from this "unambiguous" evidence.... Further, the court found his methodology in the conduct of this graduate student exercise to be so flawed as to render it unreliable and of no probative value in this case.

799 F.Supp. at 1380.

The plaintiffs also sought to prove intentional discrimination by the defendants by yet another study by Dr. Treiman which they urged established that Nassau County could not have applied the Cresap evaluation procedures in good faith. The court's findings regarding this study are set out in 799 F.Supp. at 1381–83, one portion of which is particularly significant. The court found that Dr. Treiman had no data which he compiled in each of his studies, but used, instead, data prepared for him by the plaintiffs' attorneys or their paralegals.

Another study was conducted by this expert with a view towards proving intentional discrimination in the job and salary evaluation process conducted on behalf of Nassau County by a management consulting firm (the Cresap study). The conclusions he reached in this study were also found to be unreliable for the reasons that:

> [T]he questionable—and poorly verified—assumptions on which that study is based as well as the flawed methods with which it was executed erode completely what little confidence this court might have had in Dr. Treiman's conclusions after observing his testimony. This court credits neither Dr. Treiman's testimony nor the results of his "training and experience" analysis.

799 F.Supp. at 1385.

As regards a document upon which much reliance was placed by the plaintiffs, Pl.'s Ex. 616/616–A, the court found "it more than a little remarkable that so much expert time and so much expert money were devoted to [its] exegesis ...—a document of obscure content and of dubious significance." 799 F.Supp. at 1391. The court also found Dr. Treiman's analysis of that document to be of no probative value and to provide no basis for concluding that the defendants intentionally discriminated in the execution of the job and salary evaluation process. 799 F.Supp. at 1390.

The second expert witness upon whom the plaintiffs placed significant reliance was an economist who testified frequently in Title VII actions: Dr. Stephen Michelson. This expert was found to be as evasive as the other expert, and his methodological shortcomings precluded the court from according his conclusions more than minimal weight. *See* 799 F.Supp. at 1397–1402. The reasons for the court's conclusions were:

> His study reveals serious methodological flaws: He failed to record significant decisions in his coding process; indeed, combined with the fact that he claimed to be unable to recall instructions to his staff, that failure to preserve his methodology frustrated this court in attempting to assess the trustworthiness of his "exacting model." Further, he selectively departed from his own "rules" as to coding job specifications; he made trivial terminological distinctions in some cases and failed to evaluate his work against common sense in others.... [H]e took no account of such salary determinants as the collective bargaining process and working conditions—the latter of which is a factor that employees of the Nassau County Civil Service Commission testified was significant in the [job and salary evaluation] process and has been significant ever since. Finally, Dr. Michelson's multiple regression analysis, with over seventy independent variables, completely ignored the forces of the market despite the fact that there was ample testimony as to the significance of the market in salary decisions....

799 F.Supp. at 1401–02.

In its concluding comments, upon the worth of the experts' reports and of their testimony, the court wrote:

The testimony of the plaintiffs' experts and the reports they prepared were not the proffers of detached scholars in the fields of economics, statistics and sociology who were motivated by the sole purpose of assisting the finder of facts with an objective evaluation of the relevant data; rather, they were the proffers of partisans. When expert witnesses become partisans, objectivity and scholarship are sacrificed to the need to prevail. Testimony which is prompted by that need and by that goal may deprive worthy plaintiffs of the relief that may be properly due them, or it may wreak havoc upon the reputation and the financial condition of defendants. A ready solution for the prevention or immunization of such abuses is not at hand. It may be that the only remedy is the vigorous and incisive cross-examination of experts which Wigmore characterized as "beyond any doubt the greatest legal invention ever invented for the discovery of truth." 5 Wigmore, *Evidence* § 1367 (Chadbourn rev. 1974).

799 F.Supp. at 1417.

In pondering the just disposition of this motion, the court revisits that observation and cogitates upon the idea that perhaps the only remedy is not a vigorous cross-examination, but that an award of reasonable attorney's fees may also serve to prevent or minimize the abuses. The plaintiffs attempted to prove discriminatory intent by undertaking to demonstrate that job titles in Nassau County were segregated by sex and by offering anecdotal evidence of such intent. The proof they offered in this regard fell considerably short of the mark. *See* 799 F.Supp. at 1404–06.

Returning to an earlier inquiry, can the abstract words—frivolous, unreasonable or without foundation—be applied to this concrete case? Mindful of the teaching to avoid the "temptation to engage in *post hoc* reasoning by concluding that because a plaintiff did not ultimately prevail, his action must have been unreasonable or without foundation," *Christiansburg*, 434 U.S. at 421–22, 98 S.Ct. at 700, what touchstones, excluding *post hoc* reasoning, point the way with assurance to the conclusion that an action was frivolous,

unreasonable or without foundation? Resorting to the lexicographer's understanding of those words would be to ignore another teaching, namely, that "it is one of the surest indexes of a well and developed jurisprudence not to make a fortress out of the dictionary; but to remember that statutes always have some purpose or object to accomplish, whose sympathetic and imaginative discovery is the surest guide to their meaning." *Cabell v. Markham*, 148 F.2d 737, 739 (2d Cir.1945) (L. Hand, J.), *aff'd*, 326 U.S. 404, 66 S.Ct. 193, 90 L.Ed. 165 (1945). The purpose of the statute would not be in doubt were words to be given their plain meaning. Congress would appear to have wanted not only "to clear the way for suits to be brought under the Act, [but] also ... to protect defendants from burdensome litigation," *Christiansburg*, 434 U.S. at 420, 98 S.Ct. at 700, "by providing that the 'prevailing party'—be it plaintiff or defendant—could obtain legal fees." *Grubbs v. Butz*, 548 F.2d 973, 975 (D.C.Cir.1976). A "sympathetic and imaginative discovery," however, yielded another purpose which was not to permit a routine allowance of attorney fees to successful defendants to effectively discourage suits in all but the clearest cases and to inhibit earnest advocacy. *Carrion v. Yeshiva Univ.*, 535 F.2d 722, 727 (2d Cir.1976). This judicial gloss applied to the plain meaning of the statute provides eloquent corroboration of Justice Frankfurter's observation that "[i]n matters of statutory construction ... it makes a great deal of difference whether you start with an answer or with a problem." Frankfurter, *Some Reflections on the Reading of Statutes*, 47 Colum.L.Rev. 527, 529 (1947).

■ It is the view of this court that the allowance of attorney's fees to these successful defendants would not frustrate the purpose of the Act but would further it. This is not the case in which a modestly salaried employee or group of employees unsuccessfully sought to vindicate a colorable civil right as private attorneys general against a defendant with vastly superior economic resources. The award of attorney's fees to the prevailing defendant in such a case would, understandably, frustrate the purpose of the

Act. This is a case in which the real plaintiff, a major union and a dominant force on the American labor scene, the American Federation of State, County and Municipal Employees, AFL–CIO (AFSCME) was not economically or otherwise disadvantaged. For example, it had paid just one of its experts over $850,000 in fees even before the trial began. 799 F.Supp. at 1395. It was represented by very able and experienced counsel who impressed the court with their exquisite grasp of statistics, regression analyses, and masses of complex, computer-generated tables. It is easy to imagine that the plaintiffs could have trapped a victory in the web of statistical data spun by their expert witnesses were it not for a very able and experienced defense counsel who too mastered the statistics, regression analyses and complex computer data which enabled him to expose the deficiencies both in the experts' testimony and in the studies upon which the plaintiffs so heavily relied.

■ The touchstones to a determination that an action was frivolous, without foundation or unreasonable in a case such as this can only be found in the context of the litigation as a whole. The obvious criticism of this view is that it implicates precisely the *post hoc* reasoning district courts are cautioned to avoid. The response to that criticism is that it is the duty of a court to bring the law into accordance with experience and justice. *See, e.g., Funk v. United States,* 290 U.S. 371, 382, 54 S.Ct. 212, 215, 78 L.Ed. 369 (1933). The thought was expressed more felicitously in *United Australia Ltd. v. Barclay's Bank, Ltd.,* (1941) A.C. 1, 29, *quoted in Woods v. Lancet,* 303 N.Y. 349, 355, 102 N.E.2d 691, 694 (1951), as follows: "When these ghosts of the past stand in the path of justice clanking their medieval chains the proper course for the judge is to pass through them undeterred." Those stirring reminders that the validity of a rule is not to be accepted because it was so in the reign of Henry VIII and that the mechanical application of catch phrases can keep analysis in fetters for generations are peculiarly apt as regards the inflexible, sterile application of the *"post hoc"* pronouncement.

"The life of the law has not been logic: it has been experience." Holmes, *The Common Law* 1 (1848). Experience teaches that in a case as complex as this the establishment of a *prima facie* case is a meaningless indication of whether the case is frivolous, unreasonable or without foundation. At the pleading stage a court may dismiss a complaint under Rule 12(b)(6), Fed.R.Civ.P., only if, after accepting the material facts alleged in the complaint as true, it still appears "beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 102, 2 L.Ed.2d 80 (1957); *Easton v. Sundram,* 947 F.2d 1011, 1014–15 (2d Cir.1991), *cert. denied,* —— U.S. ——, 112 S.Ct. 1943, 118 L.Ed.2d 548 (1992). Experience also teaches that in a case as complex as this—involving more than 19,000 employees in approximately one hundred and fifty job titles; a classification evaluation that extended over three years (the Cresap study); and a trial over a period of three months with thousands of pages of abstruse exhibits—it would be irresponsible to rule on a motion to dismiss at the end of the plaintiffs' case without an opportunity to make a detached evaluation of the voluminous evidence. Experience also teaches, that in a case as complex as this, an intelligent appraisal of the *Christiansburg* standards can only be made after the dust of the litigation battle has settled and after the smoke from the defense salvos has cleared. Such a critical appraisal has been made and memorialized in 799 F.Supp. 1370 (E.D.N.Y. 1992). The conclusion that the defendant is entitled to a reasonable attorney's fee is not a surrender to the temptation to engage in *post hoc* reasoning that because the plaintiff lost his action, it must have been unreasonable and without foundation. Rather, that conclusion is based precisely upon the findings of fact made with a kaleidoscopic view of the entire case which was possible only from the vantage point of time. It was that view which leaves the court secure in holding that the plaintiffs' pursuit of their claims was unreasonable and without foundation and that the award of fees to the prevailing defendants protects them from burdensome litigation.

Having decided that the defendant is entitled to a reasonable attorney's fee, the court finds that the fee of $982,407.23 requested is reasonable and that Exhibit H to the Reply Declaration of William H. Pauley III, being the contemporaneous time records upon which that request is based, satisfies the requirement of *New York State Assoc. for Retarded Children v. Carey*, 711 F.2d 1136 (2d Cir.1983). The plaintiffs' Memorandum in Opposition to Defendants' Motion does not challenge the reasonableness of the fee request, nor could they do so credibly. Having more than a passing familiarity with the complexity of this litigation both procedurally and substantively and with the quality of the representation provided by defendants' counsel, the court would unhesitatingly hold that the fee request is not only reasonable, but modest.

*Expert Witness Fees*

The resolution of the issue of the defendants' entitlement to recover fees paid to expert witnesses requires a determination of whether the amendment to 42 U.S.C. 2000e–5(k), contained in the Civil Rights Act of 1991, is retroactive. As of this date, the court would be bound to decide that it is not and that, therefore, expert witness fees are not recoverable. That decision would be required by *Wisdom v. Intrepid Sea–Air Space Museum*, 993 F.2d 5 (2d Cir.1993), which adhered to the Second Circuit's prior decision in *Butts v. City of New York Dep't of Hous. Preservation and Dev.*, 990 F.2d 1397 (2d Cir.1993), which held that the 1991 Act does not apply retroactively. *Wisdom* makes it clear that it is immaterial whether the specific provisions of the 1991 Act in issue are substantive or procedural. In deciding *Wisdom*, the Court of Appeals was aware that the Supreme Court granted certiorari to hear the issue of retroactivity in *Harvis v. Roadway Express, Inc.*, 973 F.2d 490 (6th Cir.1992), *cert. granted in part sub nom. Landgraf v. USI Film Prods.*, —— U.S. ——, 113 S.Ct. 1250, 122 L.Ed.2d 649 (1993) and *Landgraf v. USI Film Prods.*, 968 F.2d 427 (5th Cir.1992), *cert. granted in part*, —— U.S. ——, 113 S.Ct. 1250, 122 L.Ed.2d 649 (1993). Notwithstanding that awareness, the Court of Appeals deemed itself bound by its prior

opinion in *Butts* absent a change in the law by a higher authority.

In *Huntington Branch NAACP v. Town of Huntington*, 749 F.Supp. 62 (E.D.N.Y.1990), this court had before it an application for expert witness fees at a time when the propriety of awarding such fees was pending before the Supreme Court in *West Virginia Univ. Hosps., Inc. v. Casey*, 499 U.S. 83, 111 S.Ct. 1138, 113 L.Ed.2d 68 (1991). Notwithstanding that awareness the court granted the application for such fees, quoting Judge Learned Hand in *Spector Motor Serv. v. Walsh*, 139 F.2d 809, 823 (2d Cir.1943), *vacated sub nom. Spector Motor Serv. v. McLaughlin*, 323 U.S. 101, 65 S.Ct. 152, 89 L.Ed. 101 (1944), who wrote that it is not desirable

> for a lower court to embrace the exhilarating opportunity of anticipating a doctrine which may be in the womb of time, but whose birth is distant; on the contrary I conceive that the measure of its duty is to divine, as best it can, what would be the event of an appeal....

749 F.Supp. at 68 (quoting *id.*). In granting the application for expert witness fees in that case, the court discharged its duty and later learned that it did not correctly divine the event of an appeal: the award of such fees was precluded by the Supreme Court in *West Virginia Univ. Hosps., supra*. The Court of Appeals has also discharged its duty in *Wisdom*. Although this court has no reason to expect that the Court of Appeals will not fare better in divining the decision of the Supreme Court, it believes the more prudent course would be to await that decision. A determination of the expert witness fee issue will, therefore, be deferred pending that event.

SO ORDERED.