Milo John MUNSON,
Plaintiff-Appellant,

v.

Wendell R. FRISKE, John Rybak, Jr., Kenneth Todd, and Ashland County, Defendants-Appellees.

No. 83–1446, 83–3287.

United States Court of Appeals, Seventh Circuit.

Argued Sept. 21, 1984.

Decided Jan. 29, 1985.

---

Bruce H. Weitzman, McDermott, Will & Emery, Chicago, Ill., for plaintiff-appellant.

James K. Ruhly, Melli, Shiels, Walker & Pease, Madison, Wis., for defendants-appellees.

Before COFFEY and FLAUM, Circuit Judges, and CAMPBELL, Senior District Judge.[*]

FLAUM, Circuit Judge.

The plaintiff brought this action in the district court seeking declaratory, equitable, and monetary relief under 42 U.S.C. §§ 1983 and 1985(3) for an alleged violation of his first and fourteenth amendment rights arising out of the termination of his employment with the defendant Ashland County. The district court granted summary judgment to the defendants on all of the claims and awarded $42,095 in attorneys' fees against the plaintiff. On appeal, we affirm the decision of the district court.

## I.

In July 1973, plaintiff Milo John Munson began working for the defendant Ashland County as an addressograph operator and the only employee in the Register of Deeds office under the supervision of the Registrar of Deeds, defendant Wendell R. Friske. Munson was hired to fill in temporarily for another employee who had undergone surgery. In January 1974, when the County learned that the veteran employee would not be returning, Friske asked Munson, who had been working part-time and attending college full-time, to increase his hours in order to process land transfers and to prepare assessment rolls. Munson proceeded to work more hours than the usual, full-time 35-hour work week. Although Friske signed vouchers showing Munson's overtime, Munson was not paid at an increased rate for these extra hours.

In late April 1974, Friske told Munson that extra help was needed in order to eliminate the backlog in the assessment rolls. He asked Munson to write a letter to the Ashland County Board's Finance Committee describing the duties of an addressograph operator, the office's needs and problems, and the need for additional help to eliminate the backlog and meet the assessment roll deadline. On April 30, Munson gave Friske a six-page letter for submission to the Finance Committee. After explaining the office's responsibilities and its critical need for another employee, Munson noted that the pay was "despicable" since it was no more than a common floor sweeper would earn. Munson also wrote that unless the Board would compromise in order to find a solution to the staffing problem, he would have to submit the letter as his letter of resignation.

Although Friske requested the Finance Committee to allow him to hire another employee to assist Munson in entering the transfers on the assessment rolls, he did not file or discuss Munson's letter with the Finance Committee. When Munson learned that Friske had not given the letter to the Committee, he demanded that the letter be sent to inform the Committee of the need for another employee even though Friske warned that the Committee might

* The Honorable William J. Campbell, Senior District Judge for the Northern District of Illinois, is sitting by designation.

view the letter as Munson's resignation. Friske finally acceded to Munson's demand to send the letter, but he attached a cover letter to which Munson attached his own cover letter. Munson then sent the letter to defendant Kenneth Todd, the County Board chairman.

On May 13, 1974, Friske and Munson attended a Finance Committee meeting where it was decided that as soon as the assessment rolls were complete, a full-time employee would be hired to replace Munson. With the aid of an additional employee hired on a temporary basis, the tax assessment rolls were completed in mid-June 1974. On June 24, 1974, Munson sent a letter to Todd stating that the rolls were done, and referring to the demands in Munson's April 30 letter. Todd assumed that Munson was renewing those demands. In view of this letter and the fact that the assessment rolls had been completed, Todd added Munson's April 30 demands/resignation letter to the agenda for the July 1 Executive Committee meeting.

Meanwhile, in early June 1974, Munson had joined the Ashland County Courthouse Union Local 216 and had discovered upon reading the union contract that employees who worked more than 35 hours per week were supposed to be paid overtime of one and a half times the regular rate. When he approached Friske about receiving overtime pay, Friske advised Munson not to submit an overtime voucher since no one in the Register of Deeds office had ever submitted such a claim. On June 26, Munson submitted an overtime voucher to Friske which Friske refused to sign because the overtime claimed included time spent on moving cabinets rather than on working on the assessment rolls, as well as instances of working past 10:00 p.m. contrary to

Friske's directions. Later that day, Friske gave Munson a letter authorizing compensatory time off instead of overtime pay to be effective June 27.

At the Executive Committee meeting on July 1, Friske informed the Committee that Munson had become "uncontrollable" and was refusing to follow Friske's orders. Board chairman Todd proceeded to read Munson's April 30 letter to the Committee. The Committee decided that it did not have to remedy Munson's concerns because the Register of Deeds office had previously been run by one full-time employee without any extra help or equipment. The Committee voted unanimously to accept Munson's resignation pursuant to his letter of April 30.[1]

Following his termination and additional requests for overtime pay, Munson sued Ashland County for overtime pay in Wisconsin state court. The state court held that Munson was entitled to overtime pay, but that part of his claim was barred by the statute of limitations. While Munson continued to protest his termination to union representatives, Friske learned in July or August 1974 that Munson had purchased some land while he was still employed by the County. Concerned that Munson may have used confidential information gained while he was an employee in the Register of Deeds office, Friske mentioned the land purchase to an official in another County department, who proceeded to investigate the transaction.[2] After several meetings of the Finance and Executive Committees, the Board ordered a John Doe investigation into the land purchase. Based on a special prosecutor's memorandum, the state court dismissed the proceeding in April 1975 and held that Munson had possessed no criminal intent.

---

1. After he received the letter of termination, Munson sent a letter to Friske on July 2, 1974, which explained that he had not resigned and would return to his position in the office. Prior to this letter, Munson had never retracted his requests for more staff and equipment or his offer to resign made in his letter of April 30, 1974. On July 3, Friske responded to Munson's letter stating that he had sent Munson's July 2 letter to Todd, that Munson should remove his

belongings from the office, and that he should contact Todd or Finance Committee chairman Rybak if he had questions.

2. Munson reportedly paid $500 to purchase land with a welfare lien on it of over $8,000. Shortly thereafter, Munson sold the land for over $5,000.

In June 1980, Munson sued Friske, Rybak (the chairman of the Finance Committee and vice-chairman of the Board), Todd, and Ashland County in district court under 42 U.S.C. §§ 1983 and 1985(3) (1982), alleging that the defendants had unlawfully retaliated against him for exercising his federal constitutional and statutory rights by: (1) terminating his employment with the County as a result of his submission of an overtime claim, (2) neglecting to provide him with a hearing prior to termination, and (3) instigating a John Doe proceeding against him. The individual defendants moved for summary judgment based on the ground that their actions were taken in good faith. Defendant Ashland County moved to dismiss under Rule 12(b)(6) of the Federal Rules of Civil Procedure for failure to state a claim. Construing all of the defendants' motions to be for summary judgment, the district court granted summary judgment, reasoning that Munson had suffered no violation of his constitutional rights as a result of his termination and investigation by the defendants. After a hearing on Munson's ability to pay, the district court awarded attorneys' fees of $42,095 to the defendants.

On appeal, Munson claims that there were material facts in dispute regarding the circumstances of his termination and the instigation of a John Doe proceeding against him which precluded summary judgment. Munson also argues that his employment was improperly terminated because he was not given a hearing and that he has stated a valid claim under 42 U.S.C. § 1985(3) as to class-based invidious discrimination. Finally, Munson disputes the award of $42,095 in attorneys' fees against

him. We will address these issues in turn below.

## II.

### A. Retaliation for Exercise of First Amendment Rights

■ In granting the defendants' motion for summary judgment, the district court found that Munson had failed to raise any genuine issue of material fact regarding his allegation that he had been terminated in retaliation for exercising his first amendment rights by submitting a claim for overtime [3] or that the defendants had conspired to initiate a John Doe proceeding against him in retaliation for his submission of overtime claims. The district court reasoned that it was simply preposterous for Munson to allege that the submission of the overtime claim was the reason for his termination when he knew all along that his job was temporary and that a full-time employee would replace him after the assessment rolls were completed. Since the assessment rolls were completed on June 24, 1974, and Munson did not submit an overtime claim until June 26, the court found that the submission of the overtime claim could not have been the reason for his termination. The district court also noted that in terminating Munson, the Board was merely acting on his own written resignation of April 30, 1974. Furthermore, the district court found no evidence to substantiate Munson's claim that a John Doe proceeding was instituted against him in retaliation for his submission of overtime claims when there was good reason to institute the proceeding. The plaintiff disputes the classification of his April 30 letter as a letter of resignation and claims that sum-

---

**3.** In examining this issue, the district court accepted for the purpose of argument that the submission of an overtime claim is an activity protected under the first amendment. While we also decline to determine whether Munson's submission of an overtime claim is an activity protected by the first amendment and will assume that the submission was a protected activity, we do note that the Supreme Court has recently held that when a public employee speaks not as a citizen upon matters of public concern, but instead as an employee upon matters of only personal interest, a federal court is not the appropriate forum to review a personnel decision allegedly taken in reaction to the employee's activities absent the most unusual circumstances. *Connick v. Myers,* 461 U.S. 138, 147, 103 S.Ct. 1684, 1690, 75 L.Ed.2d 708 (1983); *Yoggerst v. Hedges,* 739 F.2d 293 (7th Cir.1984) (reprimand of state employee for commenting on her personal feelings toward her superior did not violate the first amendment).

mary judgment is inappropriate in a case where motive and intent play a key role.

■ Under Rule 56(c) of the Federal Rules of Civil Procedure, a district court shall render summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R. Civ.P. 56(c). By entering summary judgment for a party, the district court is concluding that based on the evidence upon which the plaintiff intends to rely at trial, no reasonable jury could return a verdict for the plaintiff. *Weit v. Continental Illinois National Bank and Trust Co.*, 641 F.2d 457, 461 (7th Cir.1981), *cert. denied*, 455 U.S. 988, 102 S.Ct. 1610, 71 L.Ed.2d 847 (1982). In reviewing a summary judgment, an appellate court must view the entire record and the inferences drawn therefrom in the light most favorable to the party opposing the motion. *United States v. Diebold, Inc.*, 369 U.S. 654, 655, 82 S.Ct. 993, 994, 8 L.Ed.2d 176 (1962); *Cedillo v. International Association of Bridge and Structural Iron Workers*, 603 F.2d 7, 11 (7th Cir.1979). If a study of the record reveals that inferences contrary to those drawn by the trial court might be permissible, then the summary judgment should be reversed. *United States v. Diebold*, 369 U.S. at 655, 82 S.Ct. at 994. Finally, although summary judgment is usually not proper in a case involving a weighing of conflicting questions of motive and intent, summary judgment is proper where the plaintiff presents no indications of motive and intent supportive of his position. *Kephart v. Institute of Gas Technology*, 630 F.2d 1217, 1218 (7th Cir.1980), *cert. denied*, 450 U.S. 959, 101 S.Ct. 1418, 67 L.Ed.2d 383 (1981); Sonenshein, *State of Mind and Credibility in the Summary Judgment Context: A Better Approach*, 78 Nw.U.L. Rev. 774 (1983).

■ Applying this legal standard to the facts of the present case, the district court's grant of summary judgment will only be reversed if inferences contrary to those drawn by the trial court might be permissible. Since we find that no inferences are permissible in this case which might suggest that Munson's submission of an overtime claim was the cause for his termination or for the institution of the John Doe proceeding, we affirm the district court's grant of summary judgment on Munson's section 1983 cause of action.

When Munson began working in the Register of Deeds office, he was hired as a part-time employee to fill in for the veteran employee who was on a leave of absence due to surgery. It was only after the County learned that the veteran employee would not be returning that defendant Friske asked Munson to work more hours each week in order to process the backlog in land transfers. On May 13, 1974, both Friske and Munson attended a Finance Committee meeting where it was decided that a full-time employee would be hired to replace Munson as soon as the land transfers had been processed and the assessment rolls had been completed. In discussing the Committee's decision a few days later on May 15, Friske reiterated to Munson that defendant Rybak had stated that Munson would be replaced when the assessment rolls had been completed. In his affidavit of March 10, 1982, Munson stated that during this conversation with Friske, Munson emphasized that regardless of whether the Board was considering replacing him, he intended to stand by Friske and complete the work. On June 24, 1974, defendant Todd received a letter from Munson which stated that the assessment rolls had been completed. Since it was not until June 26, 1974, that Munson submitted his claim for overtime pay, he could not have been terminated for submitting an overtime claim.

In addition to knowing that he was hired as a part-time employee in order to process the current assessment rolls until a full-time replacement had been found, Munson had submitted and had never retracted his

April 30 letter.[4] After describing his salary as "despicable," requesting the Board to assign him a deputy to complete the assessment rolls, and noting that certain equipment was "badly needed," Munson stated that unless the Board was able to come to some form of compromise and to be of assistance to him concerning the situation faced by the Register of Deeds office, he would "have no alternative but to give [that] letter as [his] letter of resignation and, effective immediately." Although this letter in itself cannot be deemed to be a letter of resignation since it was conditioned upon the Board not meeting his requests, the Board could have justifiedly accepted Munson's letter as his resignation in view of subsequent events.

Although Friske had asked Munson to write the letter in order to explain the needs of the Register of Deeds office for presentation to the Finance Committee on April 30, 1974, Friske failed to present the letter to the Committee. After returning from the meeting, Friske told Munson that he had not presented the letter to the Committee, but that the Committee had agreed to hire a part-time employee to aid Munson. Even though he knew that Friske was not in favor of submitting the letter[5] and that the Committee had already agreed to hire a part-time employee, Munson proceeded to send his original letter to Todd with Friske's and his own cover letter attached. In his cover letter to his original letter,

Munson concluded by saying that he looked forward to seeing steps taken to rectify the inadequacies existing in the Register of Deeds office. This cover letter did not retract the demands made by Munson in his original letter, but rather revitalized the original letter by asking the Board to give it their undivided attention. Munson would not have proceeded to forward his letter to the Board unless he had felt that his concerns had still not been addressed.

On June 24, 1974, Munson sent another letter to the Board which explained that the assessment rolls had been completed and which urged that the Board decide to provide the needed staff and equipment when meeting to restructure the office. Upon receipt of this letter and upon noticing its reference to Munson's April 30 demands, Todd placed Munson's April 30 letter on the agenda for the July 1 Executive Committee meeting. Since the Executive Committee did not want to meet all of Munson's requests made in various letters, it decided to accept Munson's April 30 letter as his letter of resignation.[6] Based on the thorough discovery and factual record in this case, we conclude that Munson has not raised any genuine issue of material fact indicating that he was terminated for submission of his overtime claim.

Similarly, Munson did not present any evidence to support his allegation that the defendants conspired to initiate a John Doe

---

**4.** In this letter to the Board, Munson himself admitted that he was classified as a "part-time individual" at the Register of Deeds office. In an answer to defendant Ashland County's interrogatory # 53, Munson stated that he "does not specifically recall ever being told that his position was permanent." Munson's part-time status was also noted by Friske in a meeting with the Executive Committee on January 15, 1974. After telling the Committee that the permanent employee in his office would not be returning to work, Friske explained that one replacement might be Munson, "a young man (college) at present, but when he graduates he will be through."

**5.** In his cover letter to Munson's letter, Friske wrote: "It is my hope that the enclosed letter will be considered objectively and a solution can be found to put the Land Description Office

in its proper prospective [sic]." In his deposition, Friske stated that he wrote the cover letter to "sweeten" Munson's letter when Munson insisted that he was going to send the letter to the Board. When questioned as to why he had to sweeten Munson's letter, Friske noted: "Well, I figured if they got that letter in its form without something from me, that they would fire the guy right there or want to. That was my impression of it and I think I conveyed that to Milo at the time."

**6.** Even after his resignation had been accepted in July 1974, Munson still pursued his demands in a letter sent to the Board of Supervisors on December 18, 1975. In this letter, Munson still requested the Board to increase salaries for employees of the Register of Deeds office, to appoint him as the head of the office, and to purchase equipment.

proceeding against him in retaliation for his submission of overtime claims. Although the John Doe proceeding was initiated after Munson filed his overtime claims, Munson has failed to present any issue of material fact which might relate the submission of claims to the investigation. In fact, the circumstances suggested that Munson had used confidential information acquired through his work with the County to contact the owner of record about purchasing some land before the County even took a tax deed. William Chase, the district attorney who had represented Munson in this land purchase, recommended to the Board on January 6, 1975, that it pursue a thorough investigation of the matter. Throughout all of these proceedings, there was no mention of Munson's overtime claim. Thus, we also affirm the district court's grant of summary judgment on this issue.

### B. Termination of Employment Without a Hearing

Munson also argues that the termination of his employment at the meeting of the Executive Committee on July 1, 1974, violated his right to due process of law since he was not given notice of the meeting or an opportunity to reply to the statements made at the meeting by his supervisor, Friske. The district court held that even if it were assumed that Munson was terminated rather than having voluntarily resigned, Munson had no liberty or property interests in his job that would have required the defendants to provide him with notice and an opportunity to be heard. The district court reasoned that since Munson was a part-time employee hired on a temporary basis and had no legitimate expectation of continued employment after the completion of the assessment rolls, he did not have a property interest in his job which would entitle him to a hearing. The district court also noted that Munson's liberty interests were not implicated by Friske's comments at the Executive Committee meeting because his comments did not impugn Munson's honesty or morality, but rather dealt with Munson's unsatisfac-

tory job performance and inability to take orders.

■■■ The Supreme Court has held that the requirements of procedural due process apply only to deprivations of interests included within the fourteenth amendment's protection of property and liberty. *Board of Regents of State Colleges v. Roth*, 408 U.S. 564, 569, 92 S.Ct. 2701, 2705, 33 L.Ed.2d 548 (1972). However, the interests falling within the concept of procedural due process are not infinite, so that a court must look to the nature of the interest at issue to see if it is encompassed within the fourteenth amendment's protection of liberty and property. *Id.* at 570–71, 92 S.Ct. at 2705–06.

■■■ According to the Supreme Court, the procedural protection of property serves to safeguard the security of interests which a person has obtained in particular benefits. *Id.* at 576, 92 S.Ct. at 2708. In *Roth*, the Court explained that having a property interest in a benefit involves more than having an abstract need, desire or unilateral expectation, but rather requires a legitimate claim of entitlement to the benefit. *Id.* at 577, 92 S.Ct. at 2709. The Court noted that property interests are not established by the Constitution, but rather by an independent source such as a state law securing certain benefits, *id.*, or a clearly implied promise of continued employment. *Smith v. Board of Education of Urbana School District*, 708 F.2d 258, 261 (7th Cir.1983); *Endicott v. Huddleston*, 644 F.2d 1208, 1214 (7th Cir.1980). For example, in *Hadley v. County of Du Page*, 715 F.2d 1238, 1241–44 (7th Cir.1983), *cert. denied*, —— U.S. ——, 104 S.Ct. 1000, 79 L.Ed.2d 232 (1984), this court held that the dismissal of a county superintendent of public works without a hearing did not violate any protected property interest because the official did not claim that his property interest arose out of any contract or statute nor out of any concept of de facto tenure. This court reasoned that unofficial promises by county board members as to reemployment amounted only to a unilateral expectation on plaintiff's part

**693**

and that the mere fact of continuous employment of fourteen years did not give rise to an entitlement of continued employment. *Id.* at 1242–44.

In the present case, Munson does not claim that his property interest arises from any contract or statute. Furthermore, Munson was hired to fill in temporarily until the permanent employee could resume her duties. When the Executive Committee was discussing selection of a replacement for the permanent employee on January 15, 1974, Friske said that Munson would be a likely candidate, who could complete the work, except for the fact that he would have to leave when he graduated from college. There was no explicit or implicit understanding that Munson would continue in the Register of Deeds office following the completion of the assessment rolls as evidenced by the agreement of the Finance Committee on May 13, 1974, to hire a full-time employee to replace Munson when the land transfers were finished. Thus, Munson has not shown that he has a protected property right in his former job. *See Smith v. Board of Education,* 708 F.2d at 261–65 (athletic coaches had no property right in their coaching positions under fourteenth amendment unless school board told them conditionally or unconditionally that it would retain them or unless it was reasonable for them to expect the school board to retain them as coaches).

In addition to a property right, the Supreme Court has held that the refusal to reemploy an individual may implicate a liberty interest where the state, in declining to rehire, makes charges against the individual that might seriously damage his standing and associations in his community. *See Board of Regents v. Roth,* 408 U.S. at 573, 92 S.Ct. at 2707. The Court explained that charges of dishonesty or immorality or statements damaging one's good name, reputation, honor or integrity would implicate liberty interests. *Id.* The Court noted that a liberty interest would also be implicated where a stigma or other disability forecloses the individual's freedom to take advantage of other employment opportunities such as when a state invokes regulations to bar a teacher from all public employment in state universities. *Id.* However, the Court warned that mere proof that the individual is "somewhat less attractive to some other employers" would not establish the requisite foreclosure of opportunities. *Id.* at 574 n. 13, 92 S.Ct. at 2707–08 n. 13.

In interpreting the Supreme Court's holding in *Roth,* this court has held that a liberty interest is implicated when either (1) the individual's good name, reputation, honor or integrity are at stake by such charges as immorality, dishonesty, alcoholism, disloyalty, Communism or subversive acts; or (2) the state imposes a stigma or other disability on the individual which forecloses other opportunities. *Adams v. Walker,* 492 F.2d 1003, 1008 (7th Cir.1974). In *Adams,* this court concluded that the state had not violated any liberty interest of a former chairman of the State Liquor Control Commission by dismissing him due to incompetence, neglect of duty, and malfeasance in office. *Id.* at 1008–09. Furthermore, the state did not even remotely foreclose his future employment opportunities such as by disqualifying him from all government employment. *Id.* Liberty is not infringed by a label of incompetence or a failure to meet a specific level of management skills, which would only affect one's professional life and force one down a few notches in the professional hierarchy. *See, e.g., Hadley v. County of Du Page,* 715 F.2d at 1247; *Stretten v. Wadsworth Veterans Hospital,* 537 F.2d 361, 366 (9th Cir.1976). A liberty interest is not implicated where the charges merely result in reduced economic returns and diminished prestige, but not permanent exclusion from or protracted interruption of employment. *Stretten v. Wadsworth,* 537 F.2d at 366.

In the present case, Friske told the Executive Committee at its July 1, 1974 meeting that Munson had become more or less "uncontrollable." Friske explained that Munson was putting in overtime when told not to work such long hours and was pursuing

unnecessary work. The statements made by Friske do not impugn Munson's good name, integrity, honor or reputation, but merely reflect an evaluation of his professional skills as an employee in the Register of Deeds office. Furthermore, even assuming, as alleged by Munson in his affidavit of March 16, 1982, that Friske accused Munson of lying in his claims for overtime work and as to the union president's request that he join the union, these statements were made in private to Munson, so that there is no basis for Munson's claim that his good name or reputation was impaired. *See Bishop v. Wood,* 426 U.S. 341, 348, 96 S.Ct. 2074, 2079, 48 L.Ed.2d 684 (1976).

Finally, there is no evidence to suggest that Munson's prospective employment opportunities have been foreclosed. In his March 16 affidavit, Munson claims that he has been "virtually unemployable" in Ashland County, but admits that he was able to secure employment as a helper in the business office of a college for several weeks in 1976 and subsequently found a full-time job in Cable, Wisconsin. Furthermore, there is no evidence that Munson's claimed inability to obtain a job was the result of any stigma or disability imposed on him by the defendants. In sum, Munson has not offered sufficient evidence to show that the defendants violated his liberty interests. Since Munson had no liberty or property interest in his job, the defendants did not have to provide him with notice and an opportunity to be heard.

## C. Class-Based Invidious Discrimination Under 42 U.S.C. § 1985(3)

In the district court, Munson claimed relief under 42 U.S.C. § 1985(3) (1982) because the defendants' decision to terminate his employment and initiate the John Doe proceeding resulted from a class-based invidiously discriminatory animus. Munson alleged that the defendants directed their discriminatory animus at County employees who submitted requests for overtime pay. The district court first noted that there was no evidence that the defendants had discriminated against any other County employees based on overtime claims. The court went on to conclude that even if Munson had submitted evidence of discrimination based on overtime claims, section 1985(3) was not intended to reach a class composed of employees who work overtime and request overtime pay.

In order to prove a violation of 42 U.S.C. § 1985(3), the Supreme Court has held that a plaintiff must show that (1) two or more defendants conspired; (2) for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws or of equal privileges and immunities under the laws; (3) one or more of the conspirators acted in furtherance of the conspiracy; and (4) such act injured a person or his property or deprived him of exercising any right or privilege of a citizen of the United States. *Griffin v. Breckenridge,* 403 U.S. 88, 102–03, 91 S.Ct. 1790, 1798–99, 29 L.Ed.2d 338 (1971). The Court has noted that section 1985(3) provides no substantive rights in itself, but rather provides a remedy for any violation of the rights that it designates. *Great American Federal Savings and Loan Association v. Novotny,* 442 U.S. 366, 372, 376, 99 S.Ct. 2345, 2349, 2351, 60 L.Ed.2d 957 (1979). In *Griffin,* the Court held that section 1985(3) was intended to extend to private conspiracies rather than to only public conspiracies involving state action. *Griffin v. Breckenridge,* 403 U.S. at 101, 91 S.Ct. at 1797. The Court emphasized, however, that in order to avoid turning section 1985(3) into a general federal tort law, a court should give full effect to the congressional purpose behind the statute by requiring, as an element of the action, proof of an invidious discriminatory motivation. *Id.* at 102, 91 S.Ct. at 1798.[7] Although the Court in *Griffin* focused on a

---

7. The Court reasoned that the general requirement of proving a class-based invidious discrimination derives from the statutory language requiring intent to deprive of "equal protection, or equal privileges and immunities." *Griffin v. Breckenridge,* 403 U.S. at 102, 91 S.Ct. at 1798.

private conspiracy, this circuit has held that the element of proof of an invidious discriminatory motivation enunciated in *Griffin* also must be proved to sustain a cause of action involving a public conspiracy. *Lesser v. Braniff Airways, Inc.*, 518 F.2d 538, 543 (7th Cir.1975).[8]

■ In *Griffin*, the Supreme Court held that a plaintiff must prove "some racial, or perhaps otherwise class-based, invidiously discriminatory animus" in order to state a cause of action under section 1985(3). *Griffin v. Breckenridge*, 403 U.S. at 102, 91 S.Ct. at 1798. However, because the conspiracy in *Griffin* was aimed at a group of blacks, the Court declined to decide whether a conspiracy motivated by invidiously discriminatory intent other than racial bias would be actionable. *Id.* at 102 n. 9, 91 S.Ct. at 1798 n. 9. In interpreting this language, the courts have held that the statute covers conspiracies involving animus other than racial bias such as animus based on ethnic origin, sex, religion or political loyalty. *Murphy v. Mount Carmel High School*, 543 F.2d 1189, 1192 n. 1 (7th Cir.1976). However, the courts have warned that many identifiable groups do not fall within the scope of section 1985(3) because the provision is not a writ by which the judiciary can offer comfort and succor to all groups experiencing social disapproval. *DeSantis v. Pacific Telephone and Telegraph Co.*, 608 F.2d 327, 334 (9th Cir.1979) (Sneed, J., concurring).

In interpreting the range of animus covered by section 1985(3), the Supreme Court has refused to construe the provision to reach conspiracies motivated by economic or commercial animus. *United Brotherhood of Carpenters and Joiners v. Scott*, 463 U.S. 825, 103 S.Ct. 3352, 3360, 77 L.Ed.2d 1049 (1983). In *Scott*, the Court

declined to extend section 1985(3) to cover a conspiracy by several unions against a construction company and its nonunion employees. *Id.* The Court reasoned that even if one could construe section 1985(3) to reach conspiracies aimed at any class or organization on account of its political views, there was no support in the provision's legislative history to suggest that it reached conspiracies motivated by bias on account of economic views, status or activities. *Id.* The Court concluded that such a construction would extend section 1985(3) into the economic life of the country in a manner not contemplated by Congress in 1871 when it passed the provision. *Id.* The Court held that economic or commercial conflicts are best dealt with by federal or state statutes addressing such problems or by general law prohibiting injuries to persons and property. *Id.* 103 S.Ct. at 3361.

In interpreting the decision in *Scott*, the District of Columbia Circuit has held that the decision sought to divide the potential scope of section 1985(3) into three categories of animus: (1) economic and commercial animus; (2) purely political (wholly nonracial) animus; and (3) racial (civil rights supporters) animus. *Hobson v. Wilson*, 737 F.2d 1, 21 (D.C.Cir.1984). The court in *Hobson* held that the Supreme Court in *Scott* eliminated conspiracies based on commercial or economic animus from the coverage of section 1985(3). *Id.* Similarly, in *423 South Salina Street, Inc. v. City of Syracuse*, 724 F.2d 26, 27–28 (2d Cir.1983), the Second Circuit declined to extend the coverage of section 1985(3) to reach a conspiracy against a taxpayer-purchaser of overassessed property who challenged the city's seizure of his property

---

**8.** The court in *Selzer v. Berkowitz*, 459 F.Supp. 347, 351–52 (E.D.N.Y.1978), however, held that when the conspiracy is public (i.e., involving state action), the plaintiff need not prove a class-based discriminatory animus. The court reasoned that the Supreme Court in *Griffin* added the animus requirement in order to limit the number of private conspiracies that would be covered by the statute. *Id.* We follow the Seventh Circuit precedent requiring a class-based

invidiously discriminatory animus to be proved in all section 1985(3) cases because the Supreme Court added the animus requirement in order to give full effect to the language and purpose of the statute. *Griffin v. Breckenridge*, 403 U.S. at 102, 91 S.Ct. at 1798. Furthermore, nothing in the language of *Griffin* indicates that the animus requirement is limited to private conspiracies. *Lesser v. Braniff*, 518 F.2d at 543.

after he failed to pay an outstanding tax liability on the property. The court reasoned that this alleged conspiracy against taxpayers-property owners was directed at even more of a purely economic class than the class of nonunion employees and employers involved in *Scott. Id.*

■ In the present case, Munson claims that the defendants' allegedly discriminatory animus was directed at County employees who worked overtime and who submitted requests for overtime pay. We hold that the conspiracy described by Munson, if there even was such a conspiracy, was motivated by bias towards individuals on account of economic views or activities. Since conspiracies motivated by economic or commercial animus are clearly beyond the scope of section 1985(3), we affirm the district court's holding that Munson has not stated a cause of action under section 1985(3).

### D. Attorneys' Fees

In the present case, the district court awarded the defendants $42,095 in attorneys' fees pursuant to 42 U.S.C. § 1988 (1982) after holding a hearing on the issue of Munson's financial ability to pay the award. On appeal, Munson claims that the facts of his case do not warrant the imposition of attorneys' fees and that the $42,095 award against him was improper because of his indigency.

■ In response to the "American Rule" whereby each party in a lawsuit bears its own attorney's fees, Congress enacted the Civil Rights Attorney's Fees Award Act of 1976, 42 U.S.C. § 1988 (1982), which authorizes a district court to award a reasonable attorney's fee to a prevailing party in civil rights litigation. *Hensley v. Eckerhart,* 461 U.S. 424, 429, 103 S.Ct. 1933, 1937, 76 L.Ed.2d 40 (1983). The courts have recognized that an attorney's fees award pursuant to section 1988 rests within the sound discretion of the trial court because that court is particular-

ly well-qualified to make the partially subjective findings necessary for an award of fees and to perform the balancing of equities that is an integral part of the proceedings for an award of fees. *Mastrippolito and Sons, Inc. v. Joseph,* 692 F.2d 1384, 1387 (3d Cir.1982); *Harrington v. DeVito and Dunne,* 656 F.2d 264, 266 (7th Cir. 1981), *cert. denied,* 455 U.S. 993, 102 S.Ct. 1621, 71 L.Ed.2d 854 (1982).

■ In view of the wide latitude granted to the district court in assessing attorney's fees, the standard of review of an award of fees to the prevailing party under section 1988 is whether the trial court abused its discretion in making or denying the award. *Reichenberger v. Pritchard,* 660 F.2d 280, 288 (7th Cir.1981). This court has concluded that review of a district court's discretion is very limited since an abuse of discretion generally only occurs where no reasonable person could take the view adopted by the trial court. *Harrington v. DeVito,* 656 F.2d at 269. If reasonable persons could differ over the trial court's view, then the appellate court will not be able to find an abuse of discretion. *Id.*

■ In *Christiansburg Garment Co. v. Equal Employment Opportunity Commission,* 434 U.S. 412, 421, 98 S.Ct. 694, 700, 54 L.Ed.2d 648 (1978), the Supreme Court formulated the general guidelines by which the district court's discretion is to be exercised. According to the Court, a district court may award attorney's fees to a prevailing defendant in a Title VII case[9] upon a finding that the plaintiff's action was frivolous, unreasonable or without foundation, even though the action was not brought in subjective bad faith. *Id.* In determining whether a suit is frivolous, unreasonable or groundless, this court has listed the following relevant factors: whether the issue is one of first impression requiring judicial resolution; whether the controversy is sufficiently based upon a

---

9. Although the issue in *Christiansburg* concerned attorney's fees under Title VII of the Civil Rights Act of 1964, the same standards have been held to apply under 42 U.S.C. § 1988. *Hermes v. Hein,* 742 F.2d 350, 356 n. 7 (7th Cir.1984).

real threat of injury to the plaintiff; whether the trial court has made a finding that the suit was frivolous under the *Christiansburg* guidelines; and whether the record would support such a finding. *Reichenberger v. Pritchard*, 660 F.2d at 288. In making its attorney's fees decision, a trial court must discuss the specific information that forms the basis of the plaintiff's suit and must explain why this information does not constitute adequate factual substance for the commencement of a non-frivolous civil rights case in order to provide a basis for appellate review. *Hermes v. Hein*, 742 F.2d 350, 357 (7th Cir.1984); *White v. South Park Independent School District*, 693 F.2d 1163, 1170 (5th Cir.1982).

▮ In the present case, the district court made explicit findings that Munson's claims were without merit and simply preposterous and could be readily disposed of. The court found that after three years of discovery, Munson had produced no evidence to substantiate his claim that the defendants instituted the John Doe proceeding as a result of Munson's submission of overtime claims. The court not only concluded that the plaintiff's claims were without merit or foundation, it also stated that the plaintiff had used the judicial system to carry on a personal vendetta against persons who performed the onerous and generally unappreciated tasks of local government. The court concluded that it would be allowing Munson to misuse the judicial process by proceeding on his claims, which had no support in the evidence and rested upon speculation, innuendo, and suspicion. In view of the lower court's detailed analysis of the facts after a review of the volumes of depositions, interrogatories, pleadings, requests for admissions, and legal arguments filed during three years of thorough discovery and development of the factual record, this court should be particularly reluctant to disturb the district court's conclusions unless there are clear indications in the record that the district court is incorrect. *See Mastrippolito v. Joseph*, 692 F.2d at 1387–88. On the

basis of the thorough record and detailed analysis by the district court in this case, we find that the district court did not abuse its discretion in awarding attorneys' fees to the prevailing defendants.

▮ In addition to determining whether to grant an award of attorney's fees to a prevailing party, the district court must also exercise its discretion in setting the amount of the fees awarded. *Curry v. A.H. Robins Co.*, 101 F.R.D. 736, 738 (N.D. Ill.1984). An appellate court can set aside the determination of the amount of the award only for a clear abuse of discretion. *Freeman v. Franzen*, 695 F.2d 485, 494 (7th Cir.1982), *cert. denied sub nom. Branche v. Freeman*, —— U.S. ——, 103 S.Ct. 3553, 77 L.Ed.2d 1400 (1983). In order to be able to effectively review the trial court's decision, the court must offer some articulation of the reasons supporting the amount of its award. *Id.* The courts have held that fee awards are an equitable matter, thereby permitting the district court to consider the relative wealth of the parties. *See, e.g., Faraci v. Hickey-Freeman Co.*, 607 F.2d 1025, 1028 (2d Cir.1979). When a court determines that a plaintiff can afford to pay the award, the congressional goal of discouraging frivolous litigation demands that the full fees be levied. *Arnold v. Burger King Corp.*, 719 F.2d 63, 68 (4th Cir.1983), *cert. denied*, —— U.S. ——, 105 S.Ct. 108, 83 L.Ed.2d 51 (1984); *Faraci v. Hickey-Freeman*, 607 F.2d at 1028.

▮ In the present case, the district court concluded that Munson had the financial ability to pay the $42,095 in attorneys' fees to the prevailing defendants. The district court based this finding on the fact that Munson transferred $85,000 worth of lien-free realty and $15,000 in encumbered realty to two corporations totally owned by Munson on April 25, 1983, after the defendants had filed a motion for attorneys' fees as prevailing parties under section 1988. Munson claimed that after he had transferred this realty to the corporations, he trans-

ferred the ownership in the two corporations to a Mrs. Koski. Although Munson claimed that Koski had loaned him more than $100,000 since 1976 and that he was merely repaying his indebtedness, he was unable to produce any cancelled checks or a written agreement evidencing these transactions. The district court found that the plaintiff's transfer of the realty was accomplished in order to shield that property from judgment for the amount of attorneys' fees sought by the defendants. The district court concluded that there could be "no reasonable explanation" for Munson's decision to suddenly pay back a woman from whom he had been borrowing enormous sums of money for a period of over six years other than to shield that property from an award of attorneys' fees. *See Charves v. Western Union Telegraph*, 711 F.2d 462, 465 (1st Cir.1983) (court upheld award of attorneys' fees to a plaintiff who had attempted to place his assets beyond the reach of anyone lawfully entitled to look to them). In sum, we hold that the district court did not abuse its discretion in awarding the prevailing defendants $42,095 in attorneys' fees.[10]

In conclusion, the district court's grant of summary judgment for the defendants and its award of $42,095 in attorneys' fees to the defendants is affirmed.

---

**10.** In its brief to this court, the defendants claim that they are entitled to attorneys' fees on plaintiff's appeal pursuant to 42 U.S.C. § 1988 and 28 U.S.C. § 1927 as well as their costs on appeal under Rule 39(a) of the Federal Rules of Appellate Procedure. We hold that the defendants are entitled to costs under Rule 39(a). However, we decline to award the defendants attorneys' fees for the plaintiff's appeal.

This court has held that attorney's fees for appellate work may be awarded to a prevailing defendant only if the plaintiff's appeal is frivolous, unreasonable or without foundation, even though not brought in subjective bad faith. *Bugg v. International Union of Allied Indus. Workers*, 674 F.2d 595, 600 (7th Cir.), *cert. denied*, 459 U.S. 805, 103 S.Ct. 29, 74 L.Ed.2d 43 (1982). Although the district court's determination that the original action was frivolous or meritless may be probative of the efficacy of the appeal, such a determination is neither necessary nor sufficient to support an award of appel-

late attorney's fees. *Id.* at 600 n. 10. In *Bugg*, this court granted appellate attorneys' fees to the prevailing defendants because the plaintiff knew its claims were frivolous long before trial, the court-appointed counsel clearly informed plaintiff that his case was wholly lacking in merit, and the plaintiff submitted a perfunctory appellate brief which failed to present any arguable reason why the district court erred in its disposition. *Id.* at 600. Finally, this court held that its explicit rejection of the plaintiff's motion for the appointment of counsel for the appeal should have served as a further indication that his allegations were meritless. *Id.* at 600–01. Thus, this court concluded that *Bugg* would be one of the few cases where defendants-appellees would be entitled to attorneys' fees for appellate work. *Id.* at 601. Under the criteria set out in *Bugg* for an award of appellate attorney's fees, we decline to award the defendants attorneys' fees for appellate work.