**Mac H. SCOTT, M.D., Plaintiff,**

v.

**SISTERS OF ST. FRANCIS HEALTH SERVICES, INC., et al., Defendants.**

No. 85 C 8224.

United States District Court, N.D. Illinois, E.D.

Oct. 15, 1986.

William P. Tuggle, Ronald L. Ashman, Chicago, Ill., for plaintiff.

John L. Conlon, Thomas C. Shields, Hopkins & Sutter, Chicago, Ill., for defendants.

## MEMORANDUM ORDER

BUA, District Judge.

The above-captioned matter came before this Court for trial on the merits of plaintiff's complaint. This Court has heard testimony on plaintiff's claims, received exhibits into evidence and examined each party's suggested findings of fact. After carefully considering the foregoing information, this Court enters the following findings of fact and conclusions of law pursuant to Rule 52(a) of the Federal Rules of Civil Procedure.

## I. FINDINGS OF FACT

### A. *The Parties*

1. Plaintiff Mac H. Scott, M.D. (hereinafter "Scott"), is a black citizen of the United States who has been licensed to practice medicine in the State of Illinois since 1982 and specializes in the field of obstetrics and gynecology.

2. Defendant Sisters of St. Francis Health Services, Inc. (hereinafter "Sisters of St. Francis") is an Indiana not-for-profit corporation owned by an order of Roman Catholic nuns and is engaged in the operation of various hospitals including St. James Hospital Medical Center in Chicago Heights, Illinois (hereinafter "St. James").

3. Defendant Sister Antoinette Marie Van Der Werf (hereinafter "Sister") is the President of St. James.

4. Defendant Adriano S. Olivar, Jr., M.D. (hereinafter "Olivar"), is President of St. James' medical staff.

5. In 1983 and again in 1985, Scott applied for medical staff membership and hospital privileges at St. James. (Tr. 20–22, 38.) For reasons detailed below, Scott's applications were not forwarded to the hospital's Credentials Committee for formal consideration. As a result, Scott was not offered staff membership or hospital privileges at St. James.

6. In September of 1985, Scott filed suit against defendants alleging racial discrimination. Specifically, Scott asserted defendants' refusal to forward his applications to St. James' Credentials Committee for formal consideration violated his rights under the Thirteenth and Fourteenth Amendments, 42 U.S.C. §§ 1981, 1985, and under Illinois common law. Defendants denied their actions violated any of Scott's rights.

### B. *Scott's Suspension From Ingalls Memorial Hospital*

7. In 1982, Scott completed his residency training in the medical specialty of obstetrics and gynecology and was licensed by the State of Illinois as a physician and surgeon. (Tr. 16–18.)

8. In June of 1982, Scott became associated with the Weiss Medical Complex in Harvey, Illinois. (Tr. 18.) As part of this association, Scott received medical staff and hospital privileges at Ingalls Memorial Hospital (hereinafter "Ingalls") in Harvey, Illinois. (Tr. 19.)

9. After 58 or 59 days, Scott's staff and hospital privileges at Ingalls were suspended on the recommendation of the Executive and Clinical Review Committee of Ingalls' Department of Obstetrics and Gynecology (hereinafter "Review Committee"). (Tr. 19.) The suspension was premised on the belief that during his short association with Ingalls, Scott had taken several actions showing gross insufficiencies in medical judgment, medical performance, and labor management. (Tr. 54; Pl.Ex. 5 at 3.)

**1468**

10. Following unsuccessful attempts to secure reinstatement, Scott filed suit against Ingalls, Dr. Alex Kaz (hereinafter "Kaz"), then Chairman of Ingalls' Department of Obstetrics and Gynecology, and the members of the Review Committee. (Def.Ex. 30.) Aside from other claims, Scott alleged his suspension from Ingalls was the result of racial discrimination. (Tr. 102–03.)

C. *Scott's First Application to St. James*

11. Sometime in September of 1983, Scott met Sister at St. James and informed her he was interested in obtaining staff and hospital privileges at St. James. (Tr. 22.) Scott told Sister he had been suspended by Ingalls and had been without staff and hospital privileges since such time. (Tr. 21.) Sister handed Scott an application form and asked him to complete it. (Tr. 22, 114.)

12. Scott completed the application and submitted it together with executed release of information form (hereinafter "Release Form") which authorized any hospital to release any information concerning Scott to St. James. According to the Release Form, applicants had "the burden of producing adequate information for proper evaluation of ... professional competency, character, ethics, and other qualification and for resolving any doubts about such qualifications." (Pl.Ex. 4.)

13. The by-laws of the Sisters of St. Francis require applicants for staff and hospital privileges to submit their written applications to the chief executive officer of the hospital. (Pl.Ex. 1 at 26.) Applications are to contain "full information concerning the applicant's health, education, licensure, practice, and previous hospital experience and concerning any unfavorable history with regard to licensure, ethical conduct or hospital privileges." (Pl.Ex. 1 at 27.) The by-laws of the Sisters empower the medical staff of the hospital to evaluate the professional competence of all applicants for clinical privileges and vests the Credentials Committee of the medical staff with the authority to grant staff and hospital privileges. (Tr. 116; Pl.Ex. 1 at 27.)

14. The constitution and by-laws of St. James' medical staff sets forth certain procedures for processing applications for staff and hospital privileges. Article II, section 4 of the constitution and by-laws states as follows:

(C) Completed applications shall be submitted to the Administrator [i.e., President], who shall transmit them to the Credentials Committee for review.

(D) Providing the applicant is not obviously ineligible as defined in section 2 of this article, the Credentials Committee shall investigate the character and qualifications of each applicant, verify the authenticity of supporting documents and credentials, and evaluate his fitness for the requested appointment to an administrative division of the medical staff.

(Pl.Ex. 2 at 5.)

D. *Concerns Raised by Scott's Suspension Proceedings at Ingalls*

15. Shortly after submitting his application for staff and hospital privileges at St. James, Scott arranged to meet with Dr. Richard Moutvic, a physician specializing in obstetrics and gynecology who was then President of St. James' Medical Staff. During their meeting, Scott submitted the following documents relating to his suspension at Ingalls: (a) patient charts of nine patients whose treatment by Scott formed the basis of the Review Committee's decision to suspend Scott; (b) minutes of various committee meetings at Ingalls relating to Scott's suspension proceedings; and (c) a typewritten document drafted by Scott purporting to be a comprehensive response to the charges made by the Review Committee (hereinafter "Comprehensive Response"). (Tr. 23–26, 162–63; Pl.Exs. 5, 6, 22, 23.) Copies of many of the same documents were also forwarded to Sister.

16. Included in the documents submitted by Scott were the minutes of an August 18, 1982 meeting between Scott, Kaz, two nurses, and Ingalls' vice president for patient care. The minutes indicated that on several occasions Scott had started labor-inducing drugs on patients and left the hospital in violation of hospital and

state regulations. The minutes reported Scott had performed cesarean sections on patients before obtaining the required consent of a consulting physician and that in many cases, Scott was advised by the consulting physicians that a cesarean section was not necessary. Also recorded in the minutes were numerous complaints of Scott's demeaning treatment of hospital personnel. Finally, the August 18 minutes describe an incident in which Scott left a staple in a patient after a nurse drew his attention to it and only when he was called back to the patient did he remove it. (Pl.Ex. 5.)

17. Also among the items delivered by Scott were the minutes of the September 16, 1982 Review Committee meeting. The minutes reflect that the Review Committee undertook a case-by-case analysis of nine patients who were asserted to have received questionable treatment by Scott. Aside from discussing many of the incidents reported in the minutes of the August 18, 1982 meeting, the Review Committee cited several cases where Scott failed to return to the hospital in time to deliver a patient's child despite receiving adequate notice of the pending delivery and giving assurances of a timely arrival. The Review Committee also noted another case where Scott failed to recognize the existence of a basic condition requiring a cesarean section. The minutes reflect that only after damaging the baby with forceps in two unsuccessful attempts to deliver vaginally did Scott finally determine a cesarean should be performed. Reviewing the occurrences in the nine cases discussed during the meeting, the Review Committee concluded that Scott's actions demonstrated "gross insufficiencies in medical judgment, the management of labor and medical performance." The committee also determined that Scott failed to follow certain hospital regulations and expressed concern over Scott's veracity. Finally, the Review Committee unanimously voted to suspend Scott's staff and hospital privileges pending a full investigation. (Pl.Ex. 5.)

E. *Scott Precludes Ingalls From Disclosing Information Concerning His Suspension*

18. Moutvic examined the materials Scott had delivered to him and forwarded a letter together with a copy of Scott's executed Release Form to obtain information concerning Scott's suspension. (Tr. 163, 168. Pl.Ex. 16.) Ingalls responded by letter stating that Scott's attorney requested no response to such an inquiry be given at this time. (Tr. 168–69; Pl.Ex. 17.) Subsequently, Scott's attorney permitted Ingalls to disclose by letter only the following information: (a) Scott and Ingalls were engaged in litigation over his suspension; (b) although Scott had been suspended, no final determinations were reached concerning Scott's privileges at Ingalls; and (c) since Scott's privileges at Ingalls were contingent upon association with Weiss Medical Complex, the natural termination of Scott's contractual association with Weiss on September 2, 1983 resulted in the automatic termination of Scott's privileges at Ingalls. (Tr. 189; Pl.Ex. 18.)

19. After receiving the foregoing information by letter from Ingalls, Moutvic contacted Kaz at Ingalls to discuss Scott's situation. (Tr. 171.) Kaz informed Moutvic he could not officially discuss the matter because Scott had effectively tied up the information. However, Kaz did tell Moutvic there were genuine concerns at Ingalls with Scott's competence, veracity, and disruptive behavior. (Tr. 171–72.)

20. In a series of subsequent meetings, Moutvic and Sister discussed with Scott the need for additional information concerning the Ingalls suspension. (Tr. 28–30, 91–96, 212–14.) As a result of their discussions, Sister concluded that Scott's application be held in abeyance until the pending litigation was resolved and more information about Scott's performance at Ingalls could be obtained. Scott was informed of this decision by letter, and his application fee was refunded. (Tr. 35, 37, 127, 198; Pl.Ex. 10.)

**F.** *Scott's Settlement Agreement with Ingalls Prevents Disclosure of Information Concerning the Suspension*

21. In January of 1985, Ingalls and Scott entered into a settlement agreement ending the parties' litigation. As part of the agreement, Ingalls could only respond to inquiries about Scott by issuing a form letter prepared by Scott's attorney which reads as follows:

> In reply to your recent inquiry regarding Dr. Mac H. Scott, please be advised that Dr. Scott was appointed to our hospital's Associate Medical Staff with provisional status in obstetrics and gynecology in July of 1982.
>
> His appointment was conditional upon his remaining in the employ of the Weiss Medical Complex. Dr. Scott's clinical privileges were suspended by the Board of Directors in September of 1982, pending an investigation into his qualifications to remain on staff at the hospital. No final determination of Dr. Scott's qualifications were [sic] ever made by the Board because Dr. Scott's association with the Weiss Medical Complex was terminated on September 2, 1983. Accordingly, Dr. Scott's staff appointment was terminated on September 2, 1983. No application for reappointment has been received from Dr. Scott. A lawsuit commenced by Dr. Scott was settled on January 2, 1985. At that time, Dr. Scott was offered reappointment to Medical Staff with immediate resignation, as of January 2, 1985, but he declined. Since that time, we have had no contact with Dr. Scott.

(Def.Ex. 11.)

**G.** *Scott's Second Application to St. James*

22. In May 1985, Scott reapplied for staff and hospital privileges at St. James (Tr. 38; Pl.Ex. 7.) However, post-settlement attempts to secure information concerning Scott's performance at Ingalls were equally unavailing. All inquiries relating to Scott were responded to with the foregoing form letter. (Tr. 138, 155, 202.)

23. Dr. Warren, then Chairman of St. James' Credentials Committee, and Dr. Olivar, then President of St. James' Medical Staff discussed the lack of sufficient information in Scott's application regarding his suspension at Ingalls. (Tr. 251–52.) Warren told Olivar that other physicians in Scott's department at Ingalls had informally told him Scott was a disruptive individual whose professional competence was open to question. (Tr. 253.) Olivar's own informal discussions with Dr. Filipowitz, former President of Ingalls, confirmed these concerns. (Tr. 249–51.)

24. Sister, Warren, and Olivar were especially troubled by the terms of the settlement agreement making Scott's reinstatement at Ingalls contingent upon his immediate resignation. (Tr. 214, 249–51.) Determining that Scott's application was devoid of any meaningful information from Ingalls, the three agreed Scott's application was incomplete and thus not suitable for formal submission to the Credentials Committee. Sister and Olivar authored a letter dated August 27, 1985 informing Scott his application could not be considered. (Pl.Ex. 11.)

25. Members of the Credentials Committee indicate that had Scott's application been forwarded for consideration, the application would have been tabled until sufficient additional information concerning Scott's suspension and settlement was forthcoming from Ingalls. (Tr. 265–68, 274–77.)

**H.** *Lack of Evidence Showing Discriminatory Intent*

26. During the six and a half years that Sister has been President of St. James, only one other black applicant for staff and hospital privileges was rejected. (Tr. 214.) The reason that applicant was refused privileges by the Credentials Committee was that the applicant's office was located outside of the St. James' service area. (Tr. 214–15.) In fact, of the twelve physicians whose applications for staff and hospital privileges were accepted in 1985 by St. James, two were black. (Tr. 215.) Moreover, Scott did not attempt to show that St. James has or would have treated any white

physician with similar questions regarding his competency any differently.

27. Overwhelming evidence shows Scott's applications were not submitted to the Credentials Committee because of a good faith belief on the part of Sister and other St. James' officials that Scott's applications did not contain sufficient information to resolve legitimate concerns as to the quality of care Scott provided, his ability to work with hospital personnel and his veracity. (Tr. 212.) Scott did not introduce any direct or credible indirect evidence that showed the decisions not to forward his applications to the Credentials Committee were racially motivated.

### I. Lack of Evidence Supporting Scott's Constitutional Claims

28. Scott offered no evidence that the conduct of any of the defendants involved state action and presented no proof of any activity relating to incidents of slavery.

### J. Lack of Evidence Supporting Scott's Breach of Contract Claim

29. No evidence presented at trial suggested that Scott ever received a copy of, read or relied upon the constitution and by-laws of the medical staff of St. James or the by-laws of the Sisters of St. Francis.

30. To the extent any of the foregoing findings of fact are deemed to be conclusions of law, they are hereby adopted as conclusions of law.

## II. CONCLUSIONS OF LAW

### A. Jurisdiction and Venue

1. This Court has jurisdiction over Scott's constitutional and statutory claims under 28 U.S.C. §§ 1331, 1343, and over Scott's state law claim under the doctrine of pendent jurisdiction.

2. Venue is proper in this district pursuant to 28 U.S.C. § 1391(b).

### B. Discrimination Claims

3. In order to prove a violation of 42 U.S.C. § 1985(3), a plaintiff must show the following: (a) Two or more defendants conspired; (b) for the purpose of depriving, either directly or indirectly, any person or class of persons of equal protection of the laws or of equal privileges and immunities under the laws; (c) one or more of the conspirators acted in furtherance of the conspiracy; (d) such act injured a person or his property or deprived him of exercising any right or privilege of a citizen of the United States. *Munson v. Friske,* 754 F.2d 683, 694 (7th Cir.1985), *citing Griffin v. Breckenridge,* 403 U.S. 88, 102–03, 91 S.Ct. 1790, 1798, 29 L.Ed.2d 338 (1971). Aside from the foregoing, the Supreme Court has required claimants to prove some racial or otherwise class-based invidiously discriminatory animus to recover under § 1985(3). *Griffin,* 403 U.S. at 102.

4. To make a prima facie case under 42 U.S.C. § 1981, a plaintiff must show (a) he was a member of a racial minority; (b) he applied and qualified for a position for which the employer was seeking applicants; (c) he was rejected despite his qualifications; and (d) the position remained open and the employer continued to seek applicants from persons having qualifications similar to the claimant. *Scarlett v. Seaboard Coast Line Ry. Co.,* 676 F.2d 1043, 1052–53 (5th Cir.1982); *Flowers v. Crouch-Walker Corp.,* 552 F.2d 1277, 1281–82 n. 3 (7th Cir.1977), *citing McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802, 93 S.Ct. 1817, 1824, 36 L.Ed.2d 668 (1973). Once a plaintiff has shown these elements to exist, the burden shifts to the employer to articulate a legitimate, nondiscriminatory reason for his refusal to hire the plaintiff. *Flowers,* 552 F.2d at 1281, *citing McDonnell Douglas,* 411 U.S. at 802, 93 S.Ct. at 1824. If the employer meets this burden, the plaintiff must then prove the employer's stated reason was in fact a pretext. *Id.*

5. Thus, to prevail under either § 1981 or § 1985(3), a plaintiff must prove the employer acted with a discriminatory intent in denying him employment, since these sections only reach acts of purposeful discrimination. *Taylor v. City of St. Louis,* 702 F.2d 695, 697 (8th Cir.1983).

6. The central question under Scott's § 1981 and § 1985 claims is whether Scott received disparate treatment from St. James because of his race.

7. At trial, defendants introduced an abundance of evidence showing why Scott's applications raised serious questions concerning his professional competence, veracity, and demeanor, why Scott's explanations of his difficulties at Ingalls provided an insufficient basis to judge his application, why information concerning Scott's suspension was unavailable from Ingalls, and why Scott's applications were never formally considered by the Credentials Committee. (Tr. 28–29, 91–95, 138, 155, 168–69, 171–72, 202, 214, 249–53; Pl.Exs. 1, 2, 4, 5.)

■ Scott asserts St. James' explanation for not formally considering his applications was a mere pretext and that the actions of Sister, Olivar and other St. James' personnel led to an unmistakable inference of a discriminatory motive. Attempting to show the existence of a discriminatory animus, Scott first sought to prove Sister exceeded her authority in refusing to forward Scott's applications to the Credentials Committee. Since a provision in St. James' by-laws states all applicants which are not obviously ineligible are to be investigated and evaluated by the Credentials Committee, Scott argues Sister's failure to forward his applications to the Credentials Committee raises an inference of discriminatory intent. (Tr. 118–22, Pl.Ex. 3.) Scott's assertion however, does not take into account the fact that the by-laws provide that Sister is to forward only completed applications to the Credentials Committee for consideration. (Pl.Ex. 3.) Sister discussed with Scott the problems he experienced at Ingalls and the need for additional information from Ingalls about his suspension. (Tr. 28–29, 91–96, 212–14.) Sufficient evidence was presented at trial to show Scott's application was incomplete and Scott's efforts prevented St. James from obtaining needed information from Ingalls. (Tr. 138, 155, 168–72, 189, 202; Pl.Exs. 17, 18; Def.Ex. 11.) As such, Sister's decisions to not forward Scott's applications were not outside the bounds of her authority as President of St. James nor indicative of any intent to discriminate against Scott on the basis of his race.

■ 9. Scott also attempted to show that Sister, Olivar, Moutvic and Warren failed to take sufficient steps to gain the information needed to process his application. Scott's testimony suggests that he was willing to provide St. James with all the requested information concerning his difficulties at Ingalls but was not given the opportunity. (Tr. 34–36, 45, 49–50.) According to Scott, defendants' failure to ask him for the information thought necessary to evaluate his applications indicates a discriminatory motive. Scott's argument, however, is misplaced. St. James desired to hear from Ingalls why Scott's comprehensive response did not resolve the Review Committee's concerns, why the Review Committee saw suspension rather than censure or probation as a necessary action pending full investigation, and why Ingalls agreed to reinstate Scott only on the condition he immediately resign. Nothing that Scott could have provided would have addressed these legitimate concerns. Evidence presented at trial leaves little doubt that repeated attempts were made to secure such information from Ingalls and that Scott was successful in foiling each of these attempts. No question exists that St. James made sufficient efforts to secure the information necessary to allow formal consideration by the Credentials Committee.

■ 10. Finally, Scott asserted that the willingness of St. James' personnel to accept unfavorable statements by certain physicians at Ingalls concerning the suspension without first consulting with Scott's references raises an inference of discriminatory treatment. Scott contended that since many of the physicians informally contacted at Ingalls had been parties in Scott's previous suit against Ingalls, Sister, Olivar, Moutvic and Warren should have known these opinions could not be trusted and should have sought additional evaluations from more objective parties. Although this Court recognizes Scott's concern that the individuals contacted at In-

galls may have possessed a certain bias against him due to the Ingalls litigation, the statements made by these physicians to St. James' personnel mirrored the concerns raised in the minutes of the suspension proceedings which Scott previously delivered to St. James. In reality, the informal statements these physicians made added nothing to the information already possessed by Sister, Olivar and the others. The statements only confirmed that certain questions concerning Scott remained open and that additional information from Ingalls was necessary to resolve them. Since input from references outside of Ingalls could not have adequately addressed such concerns, the failure to contact certain individuals provided by Scott does not raise any inference of a discriminatory animus.

11. As Scott has failed to show defendants' refusals to consider his applications were racially motivated, this Court is compelled to enter judgment in favor of defendants on Scott's § 1981 and § 1983 claims.

## C. *Constitutional Claims*

12. Scott's complaint alleges defendants' actions in denying him staff and hospital privileges at St. James violated his right to equal protection under the Fourteenth Amendment and deprived him rights guaranteed under the Thirteenth Amendment.

13. Proof of racially discriminatory intent or purpose and evidence of state action are required to show a violation of the Equal Protection Clause. *Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U.S. 252, 265–66, 97 S.Ct. 555, 563, 50 L.Ed.2d 450 (1977); *Burton v. Wilmington Packing Authority*, 365 U.S. 715, 721–26, 81 S.Ct. 856, 859–62, 6 L.Ed.2d 45 (1961).

14. A Thirteenth Amendment claim requires proof of facts involving slavery or its badges or incidents. *Palmer v. Thompson*, 403 U.S. 217, 226–227, 91 S.Ct. 1940, 1945–46, 29 L.Ed.2d 438 (1971).

15. Scott failed to show defendants acted with any discriminatory intent and produced no evidence of state action.

As such, this Court enters judgment in favor of defendants on Scott's Fourteenth Amendment claim.

16. Scott offered no proof at trial relating to slavery or the badges or incidents of slavery. Accordingly, this Court enters judgment in favor of defendants on Scott's Thirteenth Amendment claim.

## D. *Contract Claim*

17. Scott's final claim is that the failure to forward his applications for consideration constituted a breach of an implied contract under Illinois common law. Scott based this claim on the premise that when St. James accepted Scott's applications and fees, an implied contract arose to process his applications in accord with the provisions of the constitution and by-laws of St. James' medical staff. According to Scott, defendants breached this agreement when they prevented Scott's applications from being forwarded to the Credentials Committee for formal consideration.

18. In Illinois an implied contract arises from circumstances showing that the parties intended to contract or by circumstances showing a general course of dealing between them. *In Re Estate of Brumshagen*, 27 Ill.App.2d 14, 169 N.E.2d 112, 117 (1960). While unequivocal proof of a written or oral offer and acceptance is not essential to establish a contract under this theory, unambiguous conduct of one party toward another under circumstances clearly manifesting an intention that one is to perform and the other is to compensate for such performance must be shown. 17 C.J.S. Contracts § 4(b) (1963).

19. A contract implied in fact must contain all the elements of an express contract. *United States v. O. Frank Heinz Construction Co.*, 300 F.Supp. 396, 399 (S.D.Ill.1969). Thus, the party asserting the existence of an implied contract must show unequivocal conduct evidencing the extention and acceptance of an offer. An offer does not exist until the offeree is aware of the terms of the offerer's proposal. *Carroll v. Preferred Risk Ins. Co.*, 34 Ill.2d 310, 215 N.E.2d 801, 803 (1966).

20. In the instant matter, Scott has failed to show any conduct on the part of defendants that could be interpreted as an offer to process his applications in accord with the constitution and by-laws of St. James' medical staff or the by-laws of Sisters of St. Francis. Scott introduced no evidence that he was aware of or relied upon the mentioned constitution or by-laws which is asserted to have formed the basis of the implied contract. As such, no implied contract on the terms Scott asserted ever existed between the parties.

21. Even assuming the conduct of the parties resulted in an implied agreement, Scott has not shown defendants failed to perform the contract. Relevant provisions of the constitution and by-laws of St. James' medical staff required that Sister forward only "complete" applications to the Credentials Committee for formal consideration. Overwhelming evidence was presented by defendants that Scott's application was incomplete since information concerning his suspension was unavailable from Ingalls. Scott failed to provide or allow access to full information concerning his unfavorable history at Ingalls as required under the terms of applicable constitution and by-laws. Thus, Scott failed to perform a condition precedent to defendants' performance. Moreover, Sister's decisions not to forward Scott's applications were consistent with the asserted terms of performance. Thus, defendants did not breach the asserted terms of the alleged agreement. Even viewing the evidence in a light most favorable to Scott, this Court is still compelled to enter judgment in favor of defendants on Scott's pendent contract claim.

22. To the extent any of the foregoing conclusions of law are deemed to be findings of fact, they are hereby adopted as findings of fact.

23. Pursuant to Rule 52(b) of the Federal Rules of Civil Procedure, the Court reserves the right to amend the above findings and/or conclusions or make additional findings and/or conclusions upon motion of either party made no later than ten days from entry of this order and the Court may amend the judgment accordingly.

## III. CONCLUSION

For the foregoing reasons, final judgment is hereby entered in favor of defendants and against plaintiff on all claims in plaintiff's complaint.

IT IS SO ORDERED.